# CASES DECIDED

## IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## BATTLE AND WIFE V. ROCK.

### January 14, 1926.

1. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Suits to Set Aside—Sections 5184-5186 of the Code of 1919—Existing and Subsequent Creditors—Case at Bar.*—The instant case, a suitt o set aside a conveyance by a husband to his wife, was brought under section 5186 of the Code of 1919, allowing suits to be brought to set aside fraudulent deeds before the plaintiff has established his claim at law, and giving a lien from the time of bringing the suit. Section 5184 applies to cases of actual fraud, in which case the transaction therein referred to is avoided both as to existing and subsequent creditors. Section 5185 applies to voluntary conveyances, etc., or those made in consideration of marriage, and in this case the transaction, so far as it relates to creditors, is avoided only as to those creditors "whose debts shall have been contracted at the time" the conveyance was made.. In the instant case, therefore, if the complainant was entitled to the relief prayed, it must be because his debt was contracted before the deeds were made to the wife and also that the deeds were "not upon consideration deemed valuable in law," and for the purpose of this case, it might be assumed that the debt of complainant was in existence at the time the deeds were made to the wife, and the validity of the deeds, therefore, depends upon whether founded upon a valuable consideration furnished by the wife.

2. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Husband and Wife—Presumptions in Favor of Creditor—Burden of Proof.*—In a contest between the creditors of an insolvent husband and the wife over a conveyance from the husband to his wife, the presumptions are in favor of the creditors and not of the wife, and the burden is upon the wife to show by clear and satisfactory evidence the *bona fides* of the transaction.

3. HUSBAND AND WIFE—*Husband and Wife as Witnesses—Suit to Set Aside Conveyance by Husband to Wife as Fraudulent—Presumptions.*—

Prior to the adoption of the Code of 1919 neither the husband nor wife could testify in a suit by creditors of the husband to set aside a deed of the husband to the wife, as in fraud of creditors, but now both are fully competent and the case is not within the purview of section 6209 of the Code of 1919, requiring corroboration. The former presumptions were not removed, but husband and wife were no longer disqualified to testify as to the facts of the transaction.

4. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Deed by Husband to Wife— Good Faith—Case at Bar.*—In the instant case, a suit to set aside as fraudulent a deed by a husband to his wife, the husband was an honest but ignorant negro in whom his wife seemed to have had implicit confidence and to whom she entrusted the transaction of her business affairs. The purchase money for the property in question, in the instant suit, was paid at one time and the deed therefor made at another. Both husband and wife were present when the money was paid but neither was present when the deed was executed. Both say that the deed was to have been to the wife alone, and that the error in making it to them jointly was not discovered for some time, when steps were taken to correct this mistake, resulting in the deed in question, from the husband to the wife, of the property. Husband and wife were corroborated by other witnesses.

*Held:* That from the testimony there was no doubt that the first deed was to have been to the wife alone.

5. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Husband and Wife— Trusts—Wife's Money Invested by Husband in His Own Name.*—The principle upon which voluntary conveyances are held void as to existing creditors is that a man should be just before he is generous, but it is as much his duty to be just to his wife as to other persons. There is no generosity in investing a wife's money according to her direction, and if he does so and takes title in his own name, he will be held to be a trustee for her benefit. But the trust must be clearly established.

6. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Deed by Husband to Wife—Alleged False Statements of Consideration—Case at Bar.*—In a suit to set aside a deed by a husband to his wife as fraudulent, the deed recited that the consideration was $1,150. The deed was made to correct a mistake in a prior deed of the property which was made to the husband and wife jointly, whereas, it should have been to the wife alone. The consideration for this deed to the husband and wife jointly was $2,300 and when the husband released the legal title to her of a half interest he stated the consideration as $1,150.00, just one-half of the consideration paid for the whole.

*Held:* That, the recital of a consideration of $1,150 was not a false statement.

7. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Husband and Wife— Settlement on Wife for Release of Her Interest in Other Lands.*—A

settlement made upon the wife in consideration of the release of her interest in other lands of her husband will be upheld against creditors of the husband, if the settlement is not unreasonable.

8. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Husband and Wife—Case at Bar.*—In the instant case, a suit to set aside as fraudulent a deed by a husband to his wife, it appeared from the evidence that the wife refused to join her husband in a deed to other land unless she received one-half of the purchase money of that land. At that time the husband was not in debt. The husband acceded to the wife and then and therefore she was entitled to one-half of the purchase money. Afterwards, other land was purchased by the husband for the wife and paid for out of her half of the purchase money derived from the former sale, and deeded by him to her.

*Held:* That the wife furnished from her own means the entire consideration for the latter purchase and that the court erred in setting aside the deeds to her as fraudulent.

9. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Personal Judgment for Creditors—Section 5186 of the Code of 1919.*—In the instant case, a suit by a creditor to set aside a deed by a husband to his wife, as in fraud of creditors, the Supreme Court of Appeals reversed a decree against the wife in favor of the creditor, and under section 5186 of the Code of 1919 directed the lower court to enter a personal decree against the husband construing section 5186 to mean that if from any cause the result of the suit prove unavailing to any creditor united therein, the court may render a personal decree against the debtor for the amount of the creditor's claim. This feature of the statute is remedial and should be liberally construed, especially as this construction accomplishes the wise end of preventing a multiplicity of suits, terminates litigation, and does no substantial injury to the debtor.

Appeal from a decree of the Circuit Court of Charles City county. Decree for complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*Hall, Hall & Peachy,* for the appellants.

*David Meade White* and *E. V. Farinholt,* for the appellee.

BURKS, J., delivered the opinion of the court.

William Battle and Patty Battle were married in 1898. She was then about twenty-one years of age and he was seven years older. He took her to his home near Nashville, N. C., on the farm of J. W. Henry who had "near raised" him. In 1904 they desired to buy a small piece of land adjoining that of Henry for the purpose of making a home. They did not have the money to make the purchase. Mr. Henry loaned them, or one of them, it is not clear which, $95.00, without security, with which to make the purchase. They bought twelve acres and ten poles, which was conveyed to William A. Battle in 1904 for the consideration of $100.00. Henry says this money was repaid to him by Patty Battle. In 1910 they bought two acres adjoining the twelve acres at the price of $75.00. Henry advanced the money for this purchase also, and Patty, or Patsy, as she was called, "worked it out." The deed to this parcel was also made to William A. Battle. They were both hard-working, frugal colored people and stood well in the community. They worked day and night. Patsy took in washing for four or five families in Nashville, N. C. "She washed at night." She did a lot of day labor besides helping her husband on the farm. "She kept chickens, and marketed them and eggs and other produce from the farm," and Mr. Henry testified that he had "heard her speak about she wanted to get her little home paid for." She and her husband kept no separate accounts of their money transactions, and she had implicit confidence in his honesty and integrity. They both testify that they thought the land had been conveyed to them jointly. They were ignorant colored people, and he could neither read nor write. By their frugality and industry they were enabled to greatly improve the land and to erect thereon a dwelling house which in

1920 was valued at $4,000. There was a small store
house in the corner of the yard which she attended as
far as she could in the day time, and he at night. At
the time the farm was bought Battle was making
fifty cents a day and sometimes he got as much as
$1.50 a day. He was "farming and working a little."
She was "washing and ironing for the people in town."
It does not appear how much each contributed to the
purchase and improvements of the farm, but the fair
inference is that they pooled their accumulations and
treated the transaction as a kind of partnership, or
joint affair, in which each was equally interested.
Battle and his wife both testified that they owned the
North Carolina property jointly, and she further testi-
fied: "I paid one-half of the erection of the house and
everything on the property." In March, 1920, they
sold their little farm with the improvements thereon to
J. G. Henry, son of J. H. Henry, for $7,000 cash. The
purchase money was paid by check. The check could
not be found, but the purchaser testified: "I do not
remember how the check was written, but, to the best
of my recollection, it was made to William A. Battle
and wife, but I would not swear to that." Some nego-
tiations took place before this sale was consummated.
Sometimes Battle and wife were both present, some-
times only one of them. They were dickering over the
price to be paid. The purchaser testified that "William
Battle and his wife came to me, I reckon possibly two
weeks before I bought, and told me that he was
ready to sell and that there were several bids for it.
I asked him the price and he said he was asking ten
thousand dollars, and I refused taking it. A few days
afterwards he saw me and told me he would take eight
thousand, and I still refused, and a few days after-
wards he and I met in the road, his wife not present,

and he said he would split the difference, and I offered him seven thousand, and he said he was willing provided his wife was willing to it. This was about Thursday before Saturday, the day the agreement was written up." Afterwards, the purchaser saw Patsy and reported to her his conversation with her husband and she assented to the sale at $7,000. The purchaser further testified as follows:

"Q. When *did* the next time you saw Patsy Battle in regard to this transaction, and what conversation did you have with her?

"A. Well, I think it was on Saturday morning; I went to see William and her, and I asked her 'Where is William this morning?' and she said, 'he has already gone to town,' and I said, 'I come to get him this morning to fix up some papers,' and she also told me that whenever I paid, not to pay all that money to William, that half of it was her's and I immediately told her that I did not *ame* to pay but fifty dollars that day.

"Q. What, if anything, was said by Patsy Battle in this conversation about signing the deed or any condition which must be complied with before she would sign the deed?

"A. She told me that half the money was her's. And the day we came out here to pay in full, she told William, in my presence, that morning that 'now we are selling this place with the understanding that I must get my money out of it, that half the money belongs to me.'

"Q. I understand, Mr. Henry, that this conversation which you heard between William Battle and his wife, Patsy Battle, was on the day that the deed was executed and delivered to you?

"A. Yes.

"Q. Did you purchase the land for the price of seven thousand dollars?

"A. Yes.

"Q. Do you recall how this money was paid out and to whom it was paid?

"A. The first money that was paid was on Saturday, the day I was speaking of. The remainder of the seven thousand dollars, if I am not mistaken, it was on March 7th, but I would not swear to the date.

"Q. Do you remember how you paid the money and to whom?

"A. If I am not mistaken, you or Mr. Austin wrote the deed and I wrote the check and signed it. I would not swear to how it was written.

"Q. Was William Battle and his wife both present at the time one transaction was closed?

"A. Yes.

"Q. How long, in your opinion, was it that you heard Patsy Battle tell her husband that she was selling the land only on condition that she get half the money, before the transaction was closed and the money paid over?

"A. To the best of my recollection, Mr. Davenport, the Saturday morning I came out here and paid this; the evening before I saw them together and I told William that both of us would come to Nashville the next day and fix up the papers so that neither one could fly the track, and Patsy told William that whenever I paid for the land that she was to have her half of the money out of it. She laughed and told me not to pay all of this money to William but to pay part of it to her, and I told her that the money would be paid by check, and it was. I do not remember how the check was written, but to the best of my recollection it was made to William A. Battle and wife, but I would not swear to that."

The $7,000 received for the land was deposited to the credit of William A. Battle in the Bank of Nashville, N. C., and was drawn out by checks of William A. Battle, and by two cashier's checks in favor of William A. Battle, one for $3,000 and the other for $2,000. It was then agreed between Battle and his wife that he should invest her half of the amount in land for her, which should be fully paid for in cash. They both testify to this.

So far there is no conflict in the testimony.

Shortly before the consummation of the sale of the North Carolina land to Henry, William A. Battle came to Charles City county, Virginia, where he met L. J. Hilliard, a former neighbor in North Carolina, who had come to Virginia about two years previously and who had been employed by R. M. Gearhart to assist him in making sale of a tract of land which Gearhart had for sale as attorney in fact for other parties. Hilliard was an ignorant negro, who had no experience as a real estate broker, and who, notwithstanding his employment by Gearhart, undertook to advise Battle about the purchase of the Gearhart land, a tract of about eighty acres, and Battle paid him $50.00 for his services. Sometime prior to March 1, 1920, Battle had some negotiations with Gearhart about the purchase of this land, and Gearhart, who was examined as a witness for the appellee, testified that Battle paid him fifty dollars "in case of forfeit of the next contract," and that Battle was "to come before the 15th of February, the way I understood it. I could not be right positive about this. It must have been March 15th, it ran up to the 15th day of March."

All of these transactions took place before any negotiations were had with the appellee hereinafter mentioned.

On March 8, 1920, Battle got from the Bank of Nashville, N. C., the two cashier's drafts aforesaid, and some cash and set out with his wife for Charles City county. The checks and money were brought by the two in a grip which belonged to Battle, but the wife's "things were in the grip." On March 13, 1920, Battle purchased of the appellee, C. B. Rock, the latter's farm in Charles City county, Virginia, containing 253 acres, at the price of $10,000. Of this sum he paid $3,000 in cash, using therefor one of the cashier's checks, and gave his notes for the remainder at 1, 2, 3, 4 and 5 years, secured by a deed of trust on the land. This deed of trust provided for a sale in default in the prompt payment of any of the notes, in whole or in part, "after advertising the time, terms and place of sale for five successive times in some newspaper published in the city of Richmond."

Two days after the closing of this transaction, the Gearhart land was purchased at $2,300 cash, and was conveyed to William A. Battle and Patty Battle, by deed bearing date March 15, 1920. Afterwards, by deed bearing date March 10, 1921, William A. Battle conveyed to Patty Battle the one-half interest in the Gearhart land which had been conveyed to him, for the recited consideration of $1,150.

William A. Battle was unable to pay his note due March 13, 1921, and very promptly thereafter the Rock land was advertised and sold under the deed of trust aforesaid, and was purchased by the appellee, Rock, at the price of $4,750, and the net proceeds of the sale, to-wit, $4,405.10, was credited on Battle's notes, leaving a balance due on the notes of $3,854.90, with interest.

The instant suit was thereupon brought by Rock to set aside the two deeds aforesaid to Patty Battle on

the ground of actual fraud, and also on the ground that the debt to Rock was created two days before the first deed to Patty Battle, and that the whole consideration for both the deeds of March 15, 1920, and March 10, 1921, was furnished by William A. Battle, and the conveyances were on that account void as to the debt of the appellee, Rock.

There is no evidence of actual fraud on the part of Battle and wife, or either of them. Indeed, the evidence shows the utmost good faith and innocence on the part of both of them. This branch of the case may, therefore, be dismissed from further consideration.

[1, 2] This suit was brought under section 5186 of the Code, allowing suits to be brought to set aside fraudulent deeds before the plaintiff has established his claim at law, and giving a lien from the time of bringing his suit. Section 5184 applies to cases of actual fraud, in which case the transaction therein referred to is avoided both as to existing and subsequent creditors. Section 5185, copied in the margin,[1] applies to voluntary conveyances, etc., or those made in consideration of marriage, and in this case the transaction, so far as it relates to creditors, is avoided only as to those creditors "whose debts shall have been contracted at the time" the conveyance was made, and it expressly provided that "though it be decreed to be void as to a prior creditor, because voluntary or upon a consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or

[1] "Every gift, conveyance, assignment, transfer, or charge, which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made; and though it be decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers. (Code 1887, sec. 2459.)

purchasers." It is plain, therefore, that if the appellee was entitled to the relief prayed, it must be because his debt was contracted before the deeds were made to Patty Battle and also that they were "not upon consideration deemed valuable in law."

It is true that the notes and deed of trust to Rock were executed two days before the Gearhart contract was consummated by the execution of a deed, but the agreement or contract with Gearhart had been made prior to March 1, 1920, and Battle had paid $50.00 on the purchase money to bind the contract, and the evidence tends to show that Rock knew of the purchase and did not rely upon this land or the purchase money thereof as a source of credit. The evidence, however, does not show that there was in existence any enforceable contract for the purchase of the Gearhart land. For the purposes of the case, therefore, we may assume that the debt of the appellee was in existence at the time the deeds were made to Patty Battle.

It remains, therefore, to inquire, were those deeds founded upon a valuable consideration furnished by the wife? Counsel for the appellants freely admit the doctrine, so often stated by this court, that in a contest between the creditors of an insolvent husband and the wife over a conveyance from the husband to his wife, the presumptions are in favor of the creditors and not of the wife, and the burden is upon the wife to show by clear and satisfactory evidence the *bona fides* of the transaction,[1] and say that they have fully met the burden placed on the wife.

[3] Prior to the adoption of the Code of 1919 neither the husband nor the wife could testify in a case of this kind, but now both are fully competent.[2] The former

[1]See *Eason* v. *Lyons,* 114 Va. 390, and *Morrissette* v. *Cook,* 122 Va. 588, and cases cited in the two principal cases.
[2]See Code, section 6210 and revisors' note thereto.

presumptions were not removed, but husband and wife were no longer disqualified to testify as to the facts of the transaction.

[4] Most of the facts have been hereinbefore recited. William A. Battle was an honest but ignorant negro, in whom his wife seems to have had implicit confidence, and to whom she entrusted the transaction of her business affairs. The purchase money for the Gearhart farm was paid at one time and the deed therefor made at another. Both of them were present when the money was paid, but neither was present when the deed was executed. Both say that the deed was to be made to Patty alone and that the error in making it to them jointly was not discovered until October or November following, when steps were taken to correct the mistake, resulting in the correction made by the deed of March 10, 1921.

The simplicity and honesty of these two negroes is shown by the brief but concise statements they made about the purchase of the Gearhart land.

William A. Battle says: "You see the place was sold at home with the understanding that the money would be divided, and I was to take her money and pay for her place for herself. I did so and then I bought from Mr. Rock. Of course, that is about all I know, only that the place was deeded to her, I thought, but there was a mistake in the deed. * * *

"Did your wife tell you to have this Gearhart property put in her name?

"Yes.

"That was the direction you had from her in the beginning of the deal?

"Yes, sir."

Again, in reply to a question, William A. Battle said: "Because we wanted her place separate. We wanted her money put in a home and I agreed to do it."

Patty Battle says: "I washed and ironed to pay my part of it. I washed for the ladies in Nash, and I would not agree to sell that place until William agreed to put my money into another place and pay all down cash. I did not want to pay half and half, I wanted to pay all cash. That was the understanding we had," etc.

Gearhart, the only witness who testified for the appellee besides himself, testified in part as follows:

"7Q. What consideration was paid for the property conveyed by you as attorney-in-fact to William A. Battle and wife?

"7A. Twenty-three hundred dollars.

"8Q. How was the consideration paid?

"8A. It was paid in cash and checks, and to the best of my memory there was one check or draft of about two hundred dollars, probably, something like that.

"9Q. All of the twenty-three hundred was paid to you in money by check or draft?

"9A. Yes.

"10Q. Who paid the money or gave you check draft?

"10A. William A. Battle accompanied by his wife, I think.

"11Q. They were both together when they gave you the money?

"11A. I believe that both counted the money, I am not sure, I think she passed it from her hands to his hands.  *  *  *

"15Q. Mr. Gearhart, how did you happen to make this deed to both William A. Battle and Patty Battle, his wife? Please state whether this was done by instructions of parties, or either of them?

"15A. Because they wanted it done that way.

"16Q. Do you recall which of the parties instructed you to make the deed that way?

"16A. Mr. William A. Battle. He said that he was getting this farm for his wife, or Patty, or something like that; that he wanted this for Patty in case anything happened to him, he didn't want her left dependent.

"17Q. Before the deed was actually executed, with whom did you have your negotiations?

"17A. Mr. William A. Battle.

"18Q. Do you recall, Mr. Gearhart, what time it was that he told you that he wanted that farm to go to his wife, in case anything happened to him; that he did not want her to be left dependent?

"18A. Sometime during the spring of 1920.

"19Q. Was that before or after the deed was executed?

"19A. I presume it was before. He said that was to be his wife's farm, that he wanted her to have it and was going to have the deed made to her. To 'Pat' he called her."

The last answer fully corroborates Battle and his wife and shows that the farm was to be her's, not their's.

Hilliard testified that Patty Battle was sick and not present when the deed was made; that he and Mr. Gearhart were the only ones present, and that he told the lawyer to "make this to his wife; this was her money." He further testified that when William A. Battle later found that "his name was on the deed instead of his wife's, he asked the witness to come up and look after it," but that he deferred doing so and William A. Battle took it up with the attorney who drew the deed.

The appellee himself testified on this subject as follows:

"23Q. Did Mr. Battle make any statement to you about the purchase of Mr. Gearhart's place, and if so state what he said?

"23A. He told me that he was going to buy the place. He told me that he was going to deed the place to his wife, because something might happen to him before he got through with my place.

"24Q. Where were you when he made that statement?

"24A. At my house.

"25Q. How did he come to make that statement to you?

"25A. I asked him a good many questions about whether he thought he could handle my place or not, then he told me that he could pay for Uncle Dick place and pay three thousand dollars ($3,000.00) on my place and he said for fear something might happen he was going to deed that place to his wife."

There can be little doubt from this testimony that it was fully understood and agreed that the deed to the Gearhart land was to be made to Patty Battle alone, for her safety and protection, and that William A. Battle was to have no interest in it.

[5] The principle upon which voluntary conveyances are held void as to existing creditors is that a man should be just before he is generous, but it is as much his duty to be just to his wife as to other persons. There is no generosity in investing a wife's money according to her direction, and if he does so and takes title in his own name, he will be held to be a trustee for her benefit. But the trust must be clearly established. *Selling* v. *Todd*, 112 Va. 802, 72 S. E. 682, Ann. Cas. 1915D, 643.

[6] It is several times stated in the brief for the appellee that the recital in the deed from Battle to his

wife of March 10, 1921, of a consideration of $1,150, was a false statement. We do not attach any importance to this recital, in view of the facts. The consideration for the deed to the two was $2,300, and when he released the legal title to her of a half interest he stated the consideration as $1,150, just one-half of the consideration paid for the whole.

It is not necessary to advert to the fact that Patty Battle had dower in the North Carolina land for which she was entitled to compensation, for she distinctly claimed ownership of one-half of the consideration, and refused to unite in the sale unless and until her claim was recognized, and William A. Battle acknowledged and assented to her demand, and when the check for $7,000 was given for the purchase money, William A. Battle testified: "The man gave it to me, my wife sent me over to attend to it for her;" and when the Gearhart land was paid for she went with her husband and took part in the transaction. Gearhart testified on the subject as follows: "Who paid the money or gave you check or draft?" "A. William A. Battle, accompanied by his wife, I think." "Q. They were both together when they gave you the money?" "A. I believe they both counted the money. I am not sure, I think she passed it from her hands to his hands."

This is not a case of a voluntary settlement of a husband upon his wife, nor of any other kind of settlement by him upon her, but of the partial payment of a debt admittedly due her by virtue of her funds which he had in his hands as her agent or trustee. Her interest in the fund was acknowledged at a time when the husband was not indebted to the appellee or anyone else. Nor was the appellee injured by the assertion of her rights to the Gearhart land, as it sufficiently appears that he did not look to it as a source of credit.

He knew that the title to this land was to be so made
as to protect her from the very misfortune brought
about by the contract of the husband with him, and
when he asked a "good many questions" about his
ability to handle the appellee's land, he probably ascer-
tained, or could have ascertained, the source from
which the Gearhart land was to be paid for. Nor did
the appellee extend credit to William A. Battle on
account of his ownership of the North Carolina land,
for, so far as this record discloses, he knew nothing
about the title to that land until after this suit was
brought. However this may be, the evidence clearly
and satisfactorily shows that William A. Battle did
not furnish from his own means any part of the con-
sideration for the purchase of the Gearhart lands.

[7] We have not dealt with a line of cases discussed
at the bar, holding that a settlement made upon the
wife in consideration of the release of her interest in
other lands of her husband will be upheld against
creditors of the husband, if the settlement is not un-
reasonable, because we have not felt that it was neces-
sary to do so. The doctrine is well settled, but formerly
the difficulty was in the proof; the mere recital of the
fact in the deed of settlement not being sufficient.
But in the interest of the wife, the courts went so far
as to hold that "if the deed of relinquishment and
deed of settlement are contemporaneous, or made
about the same time, so that it may be reasonably pre-
sumed that the two deeds are parts of the same trans-
action, the court will so presume, and will look upon
the relinquishment as the consideration which pro-
duced the settlement." *Keagy* v. *Trout,* 85 Va. 390,
7 S. E. 329, and cases cited. See also *Savings Bank* v.
*Todd,* 114 Va. 708, 77 S. E. 446; *Ashworth* v. *Brown,*
111 Va. 356, 69 S. E. 362. In the instant case, the

deed of relinquishment was dated March 1, 1920, and deed of the Gearhart land was dated March 15, 1920. But, as before observed, this is not a deed of settlement and we need not consider the dates of the deeds, nor the amount of the alleged settlement. William A. Battle was not indebted and his wife refused to join in the deed to the North Carolina land unless she received one-half of the purchase money. She could demand what terms she pleased and no one could object, but the husband. When he acceded to her demand, she was entitled to one-half of the purchase money. That the husband did so accede is established by the testimony of William Battle and Patty Battle, corroborated by the testimony of J. G. Henry and J. W. Henry, and denied by no one. Indeed the testimony of the appellee and of R. M. Gearhart lend color to the truth of the statement of witnesses for the appellants.

[8] Upon the facts stated, we are of opinion that Patty Battle furnished from her own means the entire consideration for the Gearhart land, and that the trial court erred in holding otherwise, and in setting aside the deeds aforesaid dated March 15, 1920, and March 10, 1921, respectively.

[9] The appellee, in his bill, asks for a personal decree against William A. Battle for the deficiency on the resale of the Rock land. This question was not passed on in the decree appealed from, and if we reverse that decree, he will have failed to accomplish the object of his suit, in which event counsel for appellant insist that he is not entitled to a personal decree. Such was the holding of this court in *Wood* v. *Lester*, 126 Va. 169, 101 S. E. 52. In the course of the opinion, construing what is now section 5186 of the Code, it was held: "It may be that it would be wise for the legis-

lature to amend this statute in the interest of economy,
simplicity, and to avoid a multiplicity of suits, but
this court is powerless to extend the statutory juris-
diction which the legislature has seen fit thus to
limit." The Code of 1919 had been adopted, but had
not then gone into effect. By it that portion of the
statute in question, now section 5186, was changed
by the addition of the words printed in italics so as
to read as follows:

"If the proceeds of sale be insufficient to satisfy
the claims of all the creditors whose liens were acquired
at the same time, they shall be applied ratably to such
claims, and the court may make a personal decree
against the debtor for any deficiency remaining on the
claim of any creditor after applying thereto his share
of the proceeds of sale, *or if he be not entitled to share
in such proceeds, may render a personal decree against
the debtor for the full amount of the creditor's claim.*"
If such a change as is suggested in *Wood* v. *Lester, supra,*
was intended to be effected by the language added, it
is not happily expressed, but the language used may be
construed to mean that if from any cause the result of
the suit prove unavailing to any creditor uniting therein,
the court "may render a personal decree against the
debtor for the full amount of the creditor's claim."
This feature of the statute is remedial and should be
liberally construed, especially as this construction
accomplishes the wise end of preventing a multiplicity
of suits, terminates the litigation, and does no sub-
stantial injury to the debtor. It is also in harmony
with the first part of the section permitting the suit to
set aside fraudulent conveyances, etc., to be brought
before the creditor has established his claim at law.
A different interpretation would not aid the defendant
as the case can at any time be transferred to the law

side of the court and tried there under the provisions of section 6084 of the Code.    We shall, therefore, adopt the construction of the admendment above indicated.

For the error of the trial court in setting aside the deed of March 15, 1920, from Lucy Cogswell and W. H. Cogswell by R. M. Gearhart, attorney-in-fact, to William A. Battle and Patty Battle, and the deed of March 10, 1921, from William A. Battle and Patty Battle to Patty Battle, its decree of December 19, 1924, will be reversed and annulled, with costs to the appellant, Patty Battle, in this court and also in the trial court, and the cause remanded to the Circuit Court of Charles county, with directions to dismiss the bill as to Patty Battle, and to enter such personal decree as may appear to be proper in favor of the appellee, G. B. Rock, against the appellant, William A. Battle.

*Reversed.*