# Richmond

## Parksley National Bank, etc. v. Preston D. Parks and Wife, et als.

January 9, 1939.

Record No. 1989.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*G. Walter Mapp,* for the appellant.

*Stewart K. Powell,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This suit was instituted by the Parksley National Bank to set aside as fraudulent a deed executed by Preston D. Parks, conveying his real estate in trust to secure a debt of $32,438.96, claimed to be due by him to his wife, Margaret N. Parks. Parks and his wife each filed separate answers to the bill denying all fraud, and averring the *bona fides* of the transaction.

The cause was referred to a commissioner in chancery, who was required, among other things, to ascertain and report whether or not the deed of trust was made upon a consideration deemed valuable in law, or was executed with intent to hinder, delay, and defraud the creditors of the grantor; and what part, if any, of the alleged indebtedness to Mrs. Parks was due and owing to her by her husband.

The commissioner in chancery reported that the deed securing the debt was made upon a consideration deemed valuable in law, and was not executed with intent to hinder, delay, and defraud the creditors of the grantor; and that the entire indebtedness secured was due and owing by Preston D. Parks to his wife.

The Parksley National Bank, hereinafter referred to as the Bank, filed exceptions to the holding of the commissioner in chancery, and further excepted to so much of his report as allowed a credit of $251.45 to Preston D. Parks against the claim of the Bank in addition to a credit of $1,848.43, which latter sum the Bank contends included the $251.45.

The trial court overruled all exceptions, except that as to the credit of $251.45, upon which it did not deem it necessary to pass, and did not pass. It thereupon entered a decree confirming the validity of the deed of trust. From this decree the Bank appeals.

The principal question presented for our consideration is the validity of the deed of trust as it affects the creditors of Preston D. Parks. This question is practically narrowed down to the sole issue whether the monies received by the husband from his wife were gifts or loans.

The evidence, both oral and documentary, comprising nearly 200 printed pages, exclusive of 42 typewritten pages of copied exhibits, presented before the commissioner in chancery, was exhaustive and voluminous. The material and pertinent facts, omitting a mass of details, may be summarized as follows:

Preston D. Parks, sometimes hereinafter referred to as Dr. Parks, was a practicing physician in the small town of

Parksley, in Accomac county, from 1915 until 1928. In February, 1928, he and his family, consisting of his wife and three small children, the oldest then being twelve years of age, moved to North Carolina. They returned to Parksley in July of the same year, when he practically abandoned his professional work, and turned to farming. He owned an interest in improved real estate on the main business street of Parksley, owned and conducted a drug store, and owned and operated a farm, hereinafter referred to as Hunting Creek, in the same county, together with other personal property, farm equipment, and a team.

Mrs. Margaret N. Parks, the wife of Dr. Parks, is the daughter of the late R. Volney Nottingham, Sr., of the adjoining county of Northampton. Mr. Nottingham was a man of large means. Prior to his death in 1931, he divided much of his estate among his five children, including Mrs. Parks. In the years, 1926-'27-'28 and '29, he made several distributions of securities, consisting of stocks and bonds, to each of his children, and each of these distributions to each child averaged around $20,000. He also gave to Mrs. Parks an interest in a valuable farm in Northampton county, as well as the home which Dr. and Mrs. Parks occupied in Parksley. They were looked upon, and known in their community, as "well-to-do" persons of affluence, means and integrity.

Dr. Parks had been a patron and customer of the Parksley National Bank, both as a borrower and depositor for a number of years. He was a frequent borrower from this Bank from December, 1928, until December, 1930, when he owed it $10,500. This sum was increased by unpaid interest on his loans and by an item of $150, interest on a loan formerly made to his wife, until his indebtedness to the Bank in 1934, amounted to $11,380. The wife's note for this loan, upon payment by her, had been cancelled and no demand was made upon her for any interest thereon until this suit was brought. When the Bank surrendered the note to Mrs. Parks, it added the sum of $150, the interest now claimed, to the indebtedness of Dr. Parks, in-

cluding it in his note, and thereafter in the judgment against him. The claim of this sum against Mrs. Parks is not referred to in the report of the commissioner in chancery nor in the exceptions filed thereto.

As various loans were secured from the Bank by Dr. Parks, he left with the Bank certain stock certificates, issued in the name of Mrs. Parks, and bonds belonging to her, which he claims were left as collateral for his loans. As these stocks or bonds were sold from time to time, the proceeds therefrom were deposited by Parks in the Bank, and used to curtail or pay his loans therein or for other business purposes. Whenever it was desired to sell a particular stock or bond left with the Bank, another security of equal value would be substituted in its place.

The cashier of the Bank admitted that Parks left certain stock certificates with the Bank, "pinned fast" to his note, when he made some of his loans, but states that, with two exceptions, the certificates were unassigned and were simply held for the convenience of Dr. Parks or his wife. The exceptions referred to are two certificates of stock listed in the name of Mrs. Parks, one for 100 shares of Studebaker Company, common, and one for 100 shares of Anaconda Copper Company, common, which were then and are now held as collateral security for the indebtedness of Dr. Parks.

Both Dr. Parks and Mrs. Parks testified that during the years 1928-29, Mrs. Parks made six loans, three in each year, to her husband, aggregating the principal sum of $32,438.96.

These loans were made to the husband by the delivery to him of certain stocks and bonds, which had been formerly given to her by her father. The market value of these securities, at the time of delivery, determined the amounts of the several loans. The securities so delivered, or at least some of them, were among those used as collateral for loans secured by the husband from the Parksley National Bank. All of them were eventually sold by the husband, or at his direction, through his brokers. The checks for the net

proceeds of such sales were drawn to the order of Preston D. Parks, and were deposited by him in the Parksley National Bank, except in one instance where a deposit was made in a bank in North Carolina during his residence there. The proceeds, such as were not used to satisfy loans secured from the Bank, were used by Dr. Parks to purchase the property known as Hunting Creek, upon which he resided and conducted his farming operations, and to make extensive improvements thereon, costing more than $16,-000; to purchase for $5,000, in his own name, an additional interest in the real estate of his late father; and to pay certain other of his obligations and debts in the operation of his business interests.

Mrs. Parks produced a private record, or small memorandum book, in which she claims to have entered on or about the date of the transaction, a list of the stocks turned over to her husband, and the value thereof according to the then current market quotations. The memorandum produced by her corresponds with the names of the securities sold, the dates of the sales, and the amount for which they were sold. The deposits made by Dr. Parks in the Parksley National Bank, in his own name, from the proceeds of the sales, correspond with the amounts he received in the statements to him from his brokers.

In each of the six instances where the stocks were loaned to Dr. Parks, it is testified by each of them that he gave his wife a note for the market value of the stocks and bonds delivered to him, and promised her, at that time, that he would pay the loans in the respective amounts advanced him. Each testified most positively that there was a distinct and unequivocal agreement between them, that the amounts represented by the securities were actual loans, and not gifts or advances. The six notes were kept among the private papers of Mrs. Parks at her home in Parksley until July, 1932, when her husband gave his wife a note for $32,438.96, the aggregate of the principal of the six notes. The original six notes were then destroyed for what they considered a matter of convenience and business judgment, the several

amounts being merged in one note evidencing the entire indebtedness.

The Bank's statements show that the accounts of Dr. and Mrs. Parks with it were variously kept in the separate names of Dr. Parks and Mrs. Parks, and jointly in the names of "Margaret N. Parks or P. D." and "Dr. P. D. or Margaret N. Parks." Its books showed entries of deposit made by both of them in the several separate and joint accounts. Checks on either account were honored when drawn by either Dr. Parks or Mrs. Parks. This seemed to have been a convenient method for all parties concerned, although the evidence does not disclose that it was adopted by the direction of Dr. or Mrs. Parks. Certainly until 1933, the relations between the parties were most friendly. The officers of the Bank were personally acquainted with Dr. and Mrs. Parks. They knew that Dr. Parks was engaged in a drug store business in the same town, immediately across the street from the Bank; that he was making extensive improvements on his farm; and that to a large extent, the monies deposited by Dr. Parks came through the sale of securities that he secured from his wife, the stocks being issued in her name. It seemed not to have questioned his integrity or financial responsibility until 1932.

The deposits made by Dr. Parks in the Bank were alone checked on by him in the course of his business. The deposits made by Mrs. Parks from her income were alone checked upon by her, she being careful to confine her checks to the amount of her personal deposits. She drew on none of the proceeds from the sale of the securities.

The private memorandum book of Mrs. Parks contained entries showing the receipt of named securities from her father, their respective numbers and descriptions, the time and amount of interest or dividends due thereon, the value and disposal thereof. Under the disposal entry was a notation showing the delivery of securities to her husband of the kind, character, and value alleged to constitute the amount of his indebtedness claimed here, with the approx-

imate date of the time of disposal. Mrs. Parks also produced a mass of cancelled checks and vouchers, which showed her transactions with the Bank.

Dr. Parks produced a loose-leaf ledger sheet showing the same transactions, with relation to the securities which his wife alleged she loaned to him, as well as numerous cancelled checks, vouchers, and statements from his brokers, showing the sale of these securities at the values mentioned. This loose-leaf ledger sheet corresponds with the memorandum kept by Mrs. Parks. Both husband and wife claimed that their memoranda were made on, or near, the date of the respective transactions as shown on their records.

The Bank undertook to prove that the memoranda of the parties were not made at the time alleged, but were made subsequently to support the present claim of Dr. and Mrs. Parks. They introduced witnesses,—men who were officers in other banks, one of whom had considerable experience in identifying handwriting, and who undertook to qualify himself as an expert in that line,—and these witnesses pointed out inconsistencies in the memorandum of Dr. Parks; but were unable to positively controvert the statements of Mrs. Parks relative to her records.

While the record book of Mrs. Parks is not all that a careful, prudent business person might have kept, it is in such condition as might be expected of an inexperienced business woman, whose duties were largely as a housewife, in keeping and maintaining a home for her husband and children. It is intelligible, is consistent with her testimony; and, perhaps, all that reasonably might have been expected under the circumstances.

In April, 1932, the Bank called on Dr. Parks for a financial statement. At this time, Dr. Parks' indebtedness to the Bank aggregated $10,500, evidenced by several notes. He furnished a statement, reciting that it was made "to the Parksley National Bank for the purpose of obtaining advances of loans or notes required, or indorsed by me, and are true to the best of my knowledge and belief." He listed

his total debts at $12,500, and his assets at $40,400. Parks stated that only three or four weeks prior to this statement, he had furnished another financial statement to the Bank, which included the indebtedness that he owed to his wife; but that this was omitted from the second and final statement at the suggestion of the Bank's cashier, who advised him that it was not necessary for him to list thereon the indebtedness to his wife, and that the statement was a mere matter of form. The cashier denied the accuracy of this evidence. The only credit that appears to have been extended to Parks after this statement, was for notes taken for interest on his existing indebtedness to the Bank, payment of which he was unable to make.

After the "Bank Holiday" of March, 1933, the Bank, through its cashier, called on Dr. Parks for additional security to cover his indebtedness, and requested that he secure it by a deed of trust on his real estate. Accordingly, a deed of trust embracing the same property subsequently conveyed to secure the debt of Mrs. Parks was prepared and delivered to Parks for execution by himself and wife. This they refused to do.

On June 27, 1934, Dr. Parks called at the Bank, inquired if his note or notes "had been put to record against him," and was informed that they had not been. He says he understood they had been placed with an attorney for collection. He thereupon immediately secured the services of Mr. R. Norman Mason, a reputable attorney and at present the Commonwealth's attorney of Accomac county, to draw a deed of trust on his real estate to secure a note in the sum of $32,438.96, dated July 25, 1932, held by his wife. He explained to Mason the nature and character of his indebtedness to his wife, exhibited the note in question, which he had already himself prepared, and declared that he desired to protect his wife by giving her security for the loans made to him.

Mason, after questioning Dr. Parks as to the reason and nature of his request, became satisfied of the *bona fides* of the loan from Mrs. Parks. A deed of trust covering the

same property as that described in the deed prepared by the Bank was then drawn by Mason, with himself as trustee. On the night of the same day, June 27, 1934, it was taken by Dr. Parks, accompanied by Mason and H. T. Scarborough, another attorney at law and the postmaster at Parksley, to the home of a notary public, and there executed and acknowledged by Dr. Parks. The next morning at nine o'clock, it was recorded in the clerk's office of the county of Accomac.

Some few weeks later the Bank discovered the execution and recordation of this deed of trust. Thereafter, on August 29, 1934, it secured a judgment by confession against Dr. Parks for $11,380, with interest, fees and costs.

In September, 1934, this suit was brought to enforce payment of the said judgment, and to set aside the deed of trust made in favor of Mrs. Parks.

Subsequently, an involuntary petition in bankruptcy was filed against Dr. Parks, which he successfully resisted on the ground that he was chiefly engaged in agriculture.

It may be here mentioned that both Dr. Parks and another witness stated that the cashier of the bank, while testifying as a witness in the bankruptcy proceedings, stated that Dr. Parks had made several financial statements to the Parksley National Bank, but that the one before the court, in which no indebtedness was shown to his wife, was the last statement. There is nothing to indicate that Mrs. Parks had any knowledge of any financial statement made by Dr. Parks to the Bank.

The Bank contends that the failure of Mrs. Parks to claim interest is a badge of fraud. Mrs. Parks testified that she did not expect any interest to be paid on the debt to her; that if she had required interest it would necessarily have been used for the family; and that her husband was busy trying to get himself established in farming, the income from which all went to the family's use; that she was willing to aid her husband by loans of money without exacting interest, except as to $5,000, which she had loaned her husband to purchase an additional interest in the estate

of her husband's late father; and that interest on this sum she expected to receive in rents from the improved property thereby secured. Dr. Parks explained that he found it difficult to keep up the interest at the Bank, and was unable to pay any interest on the loans to his wife, and that it was useless to add anything to the debt, which was already greater than the amount of the property conveyed to secure it. The evidence shows that the property conveyed by Dr. Parks was much less in value than the amount of the indebtedness.

Nearly all of the property conveyed in the deed of trust had been purchased with money which was secured by Dr. Parks from his wife. His personal property, the drug store, equipment on his farm and the stock held as collateral by the Bank, were left for the Bank and his other creditors. The drug store and farming equipment were sold under execution, and realized much less than the inventory value. The common stock of the Studebaker Company is said to be worthless; but the common stock of the Anaconda Copper Company still has a value determined by the market quotations from day to day, although less than a former value.

The commissioner in chancery had the advantage of observing the demeanor of the witnesses, and their manner of testifying, in judging of the credibility and the weight to be attached to the evidence. While the report of a commissioner does not have the weight given to the verdict of a jury on conflicting evidence, it is entitled to respect, if his judgment is supported by the testimony, and unless it is clear that he has erred. Virginia Code 1936, section 6179; *Parkes* v. *Gunter,* 168 Va. 94, 190 S. E. 159; *Roark* v. *Shelton,* 169 Va. 542, 194 S. E. 681, and cases cited.

It is well settled in a long line of Virginia cases, as a general rule, that transactions between husband and wife must be closely scrutinized to see that they are fair and honest, and not merely contrivances resorted to for the purpose of placing the husband's property beyond the reach of his creditors. In a contest between the wife and her husband's creditors, the burden of proof is upon her to

show satisfactorily the *bona fides* of the transaction. While in all such cases, the presumptions are against the wife, and in favor of the creditors, the presumptions may be repelled. *Kinnier's Adm'r* v. *Woodson,* 94 Va. 711, 27 S. E. 457; *Spence* v. *Repass,* 94 Va. 716, 27 S. E. 583; *Robinson* v. *Bass' Adm'r,* 100 Va. 190, 40 S. E. 660; *Battle* v. *Rock,* 144 Va. 1, 131 S. E. 344; *Davis* v. *Southern Distributing Company,* 148 Va. 779, 139 S. E. 495; *Brunswick Bank & Trust Co.* v. *Valentine,* 158 Va. 512, 164 S. E. 569; *Fowlkes* v. *Tucker,* 164 Va. 507, 180 S. E. 302; *Morriss* v. *Bronson & Moore,* 170 Va. 516, 197 S. E. 479.

The appellant bank relies upon the case of *Fowlkes* v. *Tucker, supra,* and the authorities therein cited. In a well considered opinion, Mr. Justice Eggleston therein cited the general rule applicable in this class of cases, reviewed numerous authorities, and applied the rule to a state of facts and circumstances, which showed an invalid transaction. The evidence in that case, however, showed a situation materially different from the facts in the instant case.

In the *Fowlkes Case, supra,* the source from which a substantial part of the loan was claimed to have been made was uncertain and unsatisfactory. For a considerable length of time there was no written promise of payment of a part of the amount claimed as a loan. It had become barred by the statute of limitations. It was not established clearly that when the alleged loan was made, there was a necessary contemporaneous promise of the husband to repay it. It developed that a part of the indebtedness was not the indebtedness of the husband at all. There was an absence of books of account, cancelled checks, and records or memoranda of the transaction. The facts did not show that the amount claimed was regarded as an actual debt, and other surrounding circumstances supported the view of this court, that there was no consideration valid in law for the conveyance in question.

In the case of *Davis* v. *Southern Distributing Company, supra,* the evidence failed to show an agreement between the parties that the several transactions constituted loans

with a contemporaneous promise to pay. The circumstances were such that the law presumed that the funds delivered to the husband were gifts and not loans.

In *Brunswick Bank & Trust Co.* v. *Valentine, supra,* there was no corroborative fact, or circumstance that the original transaction represented a loan by the wife to the husband, or that there was a contemporaneous promise from him to pay the debt.

■■ Where it is shown that the wife has actually loaned her money to her husband, upon his express contemporaneous promise to repay the loan, she becomes his creditor to the same extent as any other person advancing the money under like circumstances. It is as much the duty of a husband to be just to his wife as to other persons. A conveyance of a husband's property, either in payment of a loan made to him by his wife, or as security for such a loan, with a promise of repayment by him, is a valid conveyance, and not subject to successful attack by his other creditors. *Battle* v. *Rock, supra; Kinnier's Adm'r* v. *Woodson, supra; Spence* v. *Repass, supra.*

An examination of the numerous cases involving transactions between husband and wife will show that they are controlled by the foregoing rules. While different results have been reached by the courts, such results were reached by reason of difference in the facts to which the principles were applied.

In the instant case, not only do we have the oral evidence of Dr. and Mrs. Parks, that the advancements made by Mrs. Parks were actually made as a loan, with a contemporaneous promise of repayment, evidenced by the giving of notes for the respective amounts as loans; but we have additional records and memoranda, which together with surrounding circumstances and incidents, corroborate and substantiate their evidence. There is no contradiction of the assertion that the wife possessed the means to make the loan; that she had complete confidence in her husband; that she was willing to aid him in his profession and in his business; and that she relied upon his promise to repay her.

The dealings of her husband with the Bank were such as to give it full notice of the fact that the husband was securing advances from the wife. That it chose to regard him as solvent and sufficiently able to repay them, and relied upon such assurances until the critical days of 1933, is not sufficient to convict either Dr. Parks or his wife of fraud in his choice to prefer her as a creditor over the Bank.

The presumptions against Mrs. Parks, by virtue of the circumstances surrounding the execution of the deed of trust and its recordation, are also repelled by the evidence.

We are, therefore, constrained to hold that the decree of the trial court approving the report of the commissioner in chancery, and holding that the deed of trust given to secure the debt due by Dr. Parks to his wife was made upon a valuable consideration, and without fraudulent intent, is justified by the evidence. Nor did the trial court err in refusing to direct a sale of the real property in the deed of trust described, since it is an admitted fact that it is insufficient to satisfy the debt secured thereby, and there is no equity therein for the other creditors of Dr. Parks.

The above conclusion disposes of the principal questions involved, and there only remains to be considered the following minor and incidental questions raised by the Bank:

The commissioner in chancery reported that the Bank had received the sum of $1,848.42 from a levy upon and sale of the drug store equipment and stock of goods of Dr. Parks, in addition to $251.45 from the sale of other personal property. The Bank here contends that the latter sum was included in the former. The defendants admit that if there has been a miscalculation, it may be readily corrected. The trial court reserved judgment on this question. The record before us is not sufficient for us to render a judgment. It will be necessary to remand this case for further proceedings and a determination of that particular question.

The bill prayed that, in view of "economic conditions" and the "stock market situation," the trial court advise the Bank when and in what manner the collateral mentioned herein should be sold. The court held that the stock of the Studebaker Company had no value, and took no action with regard to it, and further held that the stock of the Anaconda Copper Company was held by the Bank as collateral for the indebtedness due it by Dr. Parks, by virtue of its assignment, and subject to the control of the Bank, to be sold at such time as the Bank might deem advisable. This gave to the Bank complete and ample power to make an immediate sale accordingly.

The trial court, in the performance of its judicial functions, and in the absence of any satisfactory evidence as to the rise and fall in value of the stock, could not have been rightly expected to further advance its judgment on stock market fluctuations.

The Bank excepted to the ruling of the trial court in directing that only a part of the original exhibits be certified directly to this court, and that the remainder, comprising forty-two typewritten pages, be copied in the record. Under Virginia Code 1936, section 6357, the trial court should have certified all of the original exhibits to this court, to be used in the hearing of this appeal. The purpose of the statute is to avoid the expense of making copies and to facilitate appeals, as well as to give this court an opportunity to see and inspect the original exhibits. While the action of the trial court does not constitute reversible error, it is urged that the provisions of the statute be observed in the future.

For the foregoing reasons, we are of opinion to affirm the decree of the trial court entered on August 7, 1937, in all respects, except as to the failure to determine whether or not the sum of $251.45 is a double credit against the Bank in favor of Dr. Parks, and as to this item this cause is remanded for further proceedings and judgment.

*Affirmed in part and remanded.*