# Staunton

## SALLIE MARTIN BUCKLE, ET ALS. V. FRANK MARSHALL, ADM'R C. T. A., D. B. N. OF THE ESTATE OF BETHENIA PANNILL MARTIN, AND FRANK MARSHALL IN HIS OWN RIGHT, ET ALS.

September 5, 1940.

Record No. 2253.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*W. G. Vansant* and *W. C. Thompson,* for the appellants.

*Crews & Clement,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The purposes of this suit are to surcharge and falsify the accounts of Frank Marshall, administrator, c. t. a., d. b. n. of the estate of Bethenia Pannill Martin, to hold him personally liable for losses incurred through investments of the assets of the estate and to deprive him of compensation for his services as administrator.

Mrs. Bethenia Pannill Martin died, testate, in 1918, and her will was probated in Pittsylvania county. James L. Tredway, one of the executors nominated in her will, was duly appointed and qualified as sole executor of her estate. Tredway died in 1921, and Frank Marshall was, on the 5th day of July, 1921, appointed administrator d. b. n., c. t. a. of the said estate by the clerk of the Circuit Court of Pittsylvania county. Marshall immediately qualified as executor, giving bond with the United States Fidelity and Guaranty Company, as his surety, and entered into the performance of the duties of his trust.

Mrs. Martin, in paragraph four of her will, bequeathed and devised her property as follows:

"In trust, for my daughter Mrs. Sallie Martin Buckle now living at Newark, New Jersey, my entire estate, real, personal and mixed during her life which shall be a trust fund for her benefit and kept invested in some safe interest bearing loans or securities, the net income of which shall

be paid to my daughter for her use and support. I desire and direct that this trust shall run during the lifetime of my said daughter and at her death or as soon thereafter as is practicable the said trust shall be disposed of as provided in Section 5 next following."

Paragraphs five and six provided substantially that upon the death of her daughter, Sallie Martin Buckle, the estate should be divided into four parts, a one-fourth part to go to each of her four daughters; namely, Ruth Buckle Adams, Virginia Buckle Beattie (now Miller) Georgiana Buckle (now Settle) and Sallie Martin Buckle, with the further provision that the share of Sallie Martin Buckle, II, should be held in trust for her benefit during her lifetime and, upon her death, should be equally divided among her sisters or the heirs of their bodies, share and share alike. Sallie Martin Buckle is a person of unsound mind.

In paragraph seven of the will, the testatrix gave to her executors full power and authority to sell any "real and personal property at public or private sale, as may seem best to them and to make title to the same; to change or alter any investments of the estate or the trust herein created; if the interest of the estate or the trust funds appear to be benefited thereby, special care being taken in all cases to avoid speculation and to secure safe and profitable investments," with the direction that her executors should "keep a clear, concise and separate record of all the transactions of the estate and the trust herein created, which records shall at all times be subject to the full inspection of the heirs under this will or the beneficiaries under the trust above named."

On October 18, 1937, Sallie Martin Buckle, Ruth Buckle Adams, Virginia Buckle Beattie (now Miller) and Georgiana Buckle (now Settle) filed their bill in equity in the Circuit Court of Pittsylvania county against Frank Marshall, as administrator, etc., and in his own right, U. S. Fidelity and Guaranty Company, a corporation, etc. and Sallie Martin Buckle, II, a person of unsound mind. The bill alleged that the accounts of the administrator failed to disclose a com-

plete and itemized statement showing the dates when and from whom collections on principal and interest were received and how and when investments of the trust funds were made; that the reports did not show accurately the commissions due to the administrator; that the administrator transferred $500 from the principal to the income account and paid out that amount as income; that the administrator failed to invest the funds of the estate in accordance with law and negligently allowed the investments to become depreciated in value and subject to large losses; and that he failed to collect the income from the said estate and pay it out according to the terms of the will. It prayed that the administrator be required to make a complete and itemized account of his transactions as such, showing the dates when collections on principal and interest were received, the dates when investments were made, the nature and character of the investments and to whom made; that he be held liable for the loss in such investments and for sums paid out of the principal account; and that he be denied compensation for administering the estate because of his improper acts and his negligence in failing to perform the duties of his trust.

A guardian *ad litem*, who was appointed for the defendant of unsound mind, filed the answer of that person committing her rights and interests to the protection of the court.

Frank Marshall, individually and as administrator, d. b. n., c. t. a. filed a joint and separate answer in which he denied every allegation of negligence and personal liability and averred that he had faithfully and prudently performed his duties with the care usually required of a fiduciary, and that he had made an honest, true and accurate statement of his accounts as administrator and had properly accounted for all property, money and estate belonging to the said trust coming into his hands.

After the evidence had been taken by depositions, the judge of the Circuit Court of Pittsylvania county, being of the opinion that he was so situated as to render it improper

for him to decide the case, ordered that it be removed to the Corporation Court of the city of Danville.

On July 30, 1938, a decree was entered by the Corporation Court of the city of Danville holding that Marshall was not guilty of negligence in his investment of the funds of the said estate. That court, however, ordered that an issue out of chancery be directed to determine whether or not the administrator was negligent in delaying the collection of a note of J. J. Patterson for $8,000 after the said Patterson became bankrupt and in arrears in the payment of the interest thereon. The decree further ordered that the cause be referred to a commissioner in chancery, as a special master, to take, state and settle an account of the transactions of the administrator, showing a full and comprehensive statement of his transactions from the time he assumed his duties, and to "ascertain and clear up the matter as to one percent (1%) interest on the $4,000 Grace securities bond which bore seven percent (7%) interest." The special master was required also to "ascertain by items and dates the amount that came into the administrator's hands and each change in the status in the assets and the respective dates of the income from said principal and from what source." The expense of taking the account was charged to the administrator.

Upon the trial of the issue out of chancery, the jury found that the administrator was negligent in not having earlier foreclosed a deed of trust securing the Patterson note and fixed the amount of the damages caused by this negligence at $800. The trial court thereupon entered judgment against Marshall in the sum of $800; but directed that execution should not issue thereon until the ultimate amount of the administrator's liability should be determined in the other matters pending before the court.

The special commissioner in chancery duly proceeded to take evidence and to make investigation for the purpose of preparing the report required by said decree. Considering the mass of evidence and figures covering a long period of years, the commissioner well performed a difficult task.

Marshall appeared before the special commissioner, subjected himself to an examination, produced his records and made and stated his final administrator's report as of March 31, 1938. On the latter day, he tendered his resignation as administrator and delivered the assets of the trust estate, or the evidence of title thereto, to the clerk of the Circuit Court of Pittsylvania county.

The commissioner's report, filed April 3, 1939, showed that the principal of the estate as of March 31, 1939, consisted of $9,115.16 in cash and $3,344.84 represented by balances due on participating certificates of deposit for 7% and 6% Grace collateral security bonds, in the respective sums of $2,864.40 and $347.60, and a balance due on the Patterson deed of trust note of $132.84; and that all principal and interest received by the administrator to the date of his resignation, including interest at 7% upon the Grace collateral security bonds, had been shown and accounted for in his final report made before the special commissioner.

The plaintiffs and defendants filed exceptions to the special commissioner's report.

The trial court, on July 11, 1939, being of opinion that the administrator had filed with the commissioner satisfactory statements of his accounts as such administrator for the period from the date of his qualification to the date of his resignation, overruled the exceptions of both parties to the commissioner's report and approved and confirmed said report as made. It then adjudged and decreed that the complainant, Sallie Martin Buckle, recover of Marshall the sum of $800, with interest from November 1, 1938, until paid, and the costs of the proceeding, including a fee of $150 to the special commissioner for his services in taking the account, and dismissed the cause from the docket.

It would serve no useful purpose to relate all of the details of the evidence. Much of it is confusing, and some of it is unresponsive to the issues involved. The evidence, statements and records cover transactions extending over a period of about sixteen years. Suggested conflicts in his

reports have been explained by the administrator, and he has not been contradicted. Such conflicts have been resolved in favor of the administrator by the conclusions of the special commissioner arrived at after a consideration of all the evidence in the case.

Since the report of the master in chancery, except as to errors appearing on its face, is *prima facie* correct when the evidence is conflicting, we shall content ourselves with a summary of so much of the evidence as is material and controlling on the material issues. Virginia Code 1936, section 6179; *Trotman* v. *Trotman,* 148 Va. 860, 139 S. E. 490; *Parksley National Bank* v. *Parks,* 172 Va. 169, 200 S. E. 629, and cases cited; *Powers* v. *Powers,* 174 Va. 164, 3 S. E. (2d) 162.

When the original executor, James L. Tredway died, it was discovered that he had not made any report or accounting of his transactions as executor of Mrs. Martin. He left the affairs of her estate in confusion, there being no records or books to show the correct status of his fiduciary account therewith.

In 1921, the personal representative of Tredway's estate turned over certain notes and securities, purporting to be the assets of the estate of Mrs. Martin, amounting to $8,506.71, to Frank Marshall who had qualified as executor of that estate. Marshall, having had some previous knowledge of Mrs. Martin's affairs and doubting that all of Mrs. Martin's estate had been accounted for, made an investigation to determine the nature and extent of the assets that went into the hands of Tredway. After an extensive investigation into every available source, Marshall made up and presented a claim against the Tredway estate for an additional sum of $5,501.91 and interest thereon.

This claim was filed in a suit pending for the settlement of the estate of Tredway, and on August 27, 1926, Marshall, as executor, was allowed the sum of $7,085.18 as the balance of principal and interest due the Martin estate from the Tredway estate. Of this amount, $1,283.23 was interest accumulated to the date of the allowance.

Marshall, after paying attorneys' fees, amounting to $808.50, which were incurred in part in making the collection of $7,085.18, arbitrarily carried $6,000 of the fund last received to his principal account, which already amounted to $7,000, thereby increasing the apparent total principal to $13,000.

In 1925, Marshall purchased a $5,000 interest in an $8,000 note made by J. J. Patterson and secured by a first deed of trust on his home. He afterwards purchased the remaining $3,000 interest in the said note.

Between April 1, 1929 and April 1, 1930, he purchased $5,000 in bonds issued by the Grace Securities Corporation, payable to bearer. One of those bonds for $500 was paid before April 1, 1930. The remaining $4,500 in bonds purchased were called in as of October 1, 1931, and exchanged for registered bonds, the new bonds being registered in the name of Frank Marshall, individually. One of these bonds for $4,000 bore interest at the rate of seven per cent. When issued, it was secured by a deposit of a small amount of cash with a trust company and by an interest in a number of first and second mortgage real estate notes, most of which were second mortgage notes, which under the terms of the indenture, aggregated not less than 125 per cent of the principal of the bonds then outstanding. The other bond of $500 bore interest at the rate of six per cent and was secured by an amount of cash deposited with the trustee and by notes secured by first mortgages not exceeding fifty per cent of the appraised valuation.

In 1930, the rapidly advancing shadows of the tragic financial and economic depression, which was to be felt so severely later on, began to affect all classes of property and securities. Real values disappeared almost overnight. The financial markets became more or less panic-stricken. Confidence was lost in financial institutions, and this lack of confidence reflected itself unfavorably in all property holdings. Owners were being required to dispose of their assets at low prices and would-be buyers with funds were few and slow to act.

The record and memories of the bitter years following and the reaction of the depression upon the fortunes of individuals, corporations and the State itself are all too fresh to need recital here. The courts of this State and of the nation have recorded judicial recognition thereof in many reported cases.

In 1929, at the outset of the developing financial distress, J. J. Patterson, a man of former substantial means and the maker of the $8,000 note, was adjudged bankrupt. However, he continued to reside in his home and to pay interest on the note regularly until October, 1930. From October, 1930, to October, 1937, delinquent taxes amounting to $570 accumulated against the property, and during the same period the administrator collected only $755 in interest. Patterson moved from his home in October, 1937, and, in February, 1938, the deed of trust was foreclosed. The property sold for $9,000. The administrator realized the sum of $7,867.16 from the sale, leaving $132.84 due on the principal. There was also due interest from 1930 to 1938, less a credit for payments made amounting to $755.

Several witnesses, qualified to speak on real estate values, placed a valuation of eighteen to twenty thousand dollars on the property of Patterson during 1925 and 1926, when the loan thereon was purchased by Marshall for the estate. The loan was considered by them as one of the highest grade. Fire insurance was carried on the property in the sum of $16,000. However, after 1930, due to the shrinkage of values generally, it was thought, as a result of sales of similar property in the same community, that it would not have brought, at a forced sale, more than $5,000.

Patterson was appointed postmaster of Chatham, Virginia, in 1933, at a salary of $2,400. He continued to live in the property and to keep it in good condition, paid only small amounts from time to time on the interest, and let the taxes go in default. Marshall declares that he paid from his private funds the premiums on the insurance on this property, without claim for reimbursement from the trust estate, to protect the loan.

For Marshall's delinquency in permitting this condition to continue without making sale of the property, taking steps to collect the interest, or otherwise protecting the loan, he was found guilty of negligence and the sum of $800 in damages was awarded against him. Since this particular matter is not an issue in this proceeding, it will not be further pursued. It has been mentioned only because of the relation it bears to other matters in issue.

The Grace Securities bonds were called in exchange for registered bonds in 1930, because of the necessity, occasioned by the depression, of securing an extension for the time of their payment. During the period of extension of the time of the maturity of the 7 per cent bonds, 23 per cent of the principal was paid, as well as interest on the principal to April 1, 1936. A participating certificate in a company organized to protect the bondholders was issued in lieu of this bond in 1936, since which time a further 7 per cent has been paid. On the 6 per cent bond for $500, interest has been paid to January 1, 1936, and a total of 38 per cent has been paid on the principal. A certificate of deposit of like character has also been issued for this bond. It is estimated that about 10 per cent additional will be paid upon the $4,000 bond and, perhaps, 35 per cent additional on the $500 bond. There is a balance of $2,864.40 due upon the $4,000 bond, and a balance of $347.60 on the six per cent bond.

The bonds of the Grace Securities Corporation were issued by a reputable bond investment house. The bonds of both classes were sold to many of the banks in Virginia, and were purchased by men considered to be sound and conservative financiers. They were even approved by state bank examiners as sound and satisfactory investments in the portfolios of securities of banks.

In 1931, when the coupon bonds, payable to bearer, were exchanged for registered bonds, it was impossible to dispose of them without loss because of the financial depression. Marshall explains that when they were exchanged he had them registered in his name, rather than as administra-

tor, so that he could otherwise avoid delay, costs and difficulties in making a transfer or sale of them, since if they were sold as belonging to an estate, it would be necessary for him to acquire, produce and show authority to make the sale. He testifies that, when the bonds were received, he wrote on each of them that they belonged to the estate of Mrs. Martin; that he kept them so earmarked in an envelope separate from other assets in his possession; and that payments made thereon were deposited in bank to the credit of his account as administrator of Mrs. Martin's estate.

In 1931, Mrs. Sallie Martin Buckle, the beneficiary, was in need of money and pressing the administrator to let her have some. He, being unable to do this because of the default in interest payments by Patterson, wrote her that he could not disturb the principal. Upon subsequent reflection, however, he found that he had erroneously credited more than $500, properly belonging to income, to the principal account when he carried $6,000 of the Tredway collection to the principal account in 1926. He, therefore, in 1931, remitted to Mrs. Sallie Martin Buckle a sum of $200 and later an additional sum of $300, thereby reducing the principal account to the sum of $12,500.

Marshall filed an account of his transactions as administrator before the commissioner of accounts in 1923, 1925, 1926, 1928, 1929, 1930, 1935, January 15, 1937, September 1, 1937, and March 31, 1938. When he resigned as administrator on the latter date, he delivered to the clerk of the Circuit Court of Pittsylvania county, $9,155.16 in cash, the two participating certificates of deposit, one for $2,864, representing the balance due on the 7 per cent Grace Securities bond, and one for $347.60, representing the balance due on the 6 per cent Grace Securities bond, and a claim for $132.84, the balance due on the Patterson note, making a total principal of $12,500.

The accounts from 1923 to 1935, inclusive, were approved by the commissioner of accounts, examined by the Circuit Court of Pittsylvania county, and by that court confirmed

and ordered to be recorded. The January 15, 1937, report was approved by the commissioner of accounts and, after it had been filed for thirty days without any exception being taken thereto, was, by the clerk of the court, confirmed and recorded. The report filed in September, 1937, is in conformity with the report made and filed before the special master appointed in these proceedings by the trial court.

As reported by the special master, the records disclosed that from 1925 to 1930, inclusive, Marshall charged himself as administrator with a principal sum of $13,000. His accounts for this period do not undertake in every instance to show from what source, from whom and upon what dates the interest was collected. He, however, charged himself with the interest on the full amount for the entire period at the rate of 6 per cent, whether the money was in his hands or invested, and thus accounted for all interest due thereon. After April 1, 1930, the reports of the administrator give an accurate account of the interest collected, from whom and for what period.

 Marshall states that his reports, as filed by the commissioners of accounts, failed to show all the information which he furnished to them. In the long period elapsing since the accounts were made, many of the records have become lost or misplaced. He explains that he did not make annual reports between 1931 and 1933, because the investments were unchanged and little or no income was received from them. He says that he kept in touch with the attorney who represented Mrs. Sallie Martin Buckle and furnished him with copies of the accounts filed and with such further information as he requested. This is a defense which would not be satisfactory if the estate suffered a loss through the failure of his duty.

No matter to whom the funds of the estate were loaned between 1921 and 1930, inclusive, or the time when interest was paid thereon, the fact remains that Marshall, during these years, accounted for all of the estate and for all of the interest accruing thereon by charging himself with and paying full interest. The life beneficiary, the only

one interested in the income from the estate, made no complaint as to the manner in which the estate was being handled until 1937, two years after the full and complete report of the administrator for 1935 had been filed. There is no evidence of any fraud or dishonesty on the part of the administrator and no proof of any shortage in his accounts.

Marshall was for many years an employee and an officer in the Chatham Savings Bank in his county. He rose from the position of clerk to the office of vice-president. He displayed a high degree of intelligence and energy in recovering from the estate of the former executor, under very difficult circumstances, a substantial amount of undisclosed trust assets. His reports and attitude indicated a desire to further the best interests of the estate and to protect it for the benefit of those who were entitled thereto.

It is true that it would have been well for the administrator to have followed a stricter method in making his records, in keeping his accounts, in preserving the identity of the assets of the estate, and in presenting his reports; but it is also true that no loss is shown to have resulted to the estate from the manner and method in which his accounts were kept and reported. The loss occasioned by his laxity in not earlier subjecting a security to the payment of a loan, he is required to make good. On the other hand, his meritorious services, which resulted in adding a substantial amount to the assets of the estate, should receive favorable consideration.

In Virginia, rules as to the liability of a fiduciary for the investment of trust funds and his right to compensation have been repeatedly stated in clear terms.

Mr. Justice Gregory, after discussing the development of and the reasons for the rule relating to the duty of a fiduciary in the investment of trust funds, and reviewing the earlier and latest Virginia cases, said, in *Powers* v. *Powers,* 174 Va. 164, 3 S. E. (2d) 162:

"The rule as to liability of a fiduciary in Virginia is founded upon the law of negligence. Judge Harrison in his work, Wills and Administration, Vol. 1, page 705, says:

'The inquiry in every case in which it is sought to fix a liability upon a fiduciary is: 1. Did he act within the scope of his powers and duties; 2. Did he act in good faith? 3. Did he act with ordinary prudence? If he did so act, he is not responsible for the consequences of the act, though it result in the loss of the trust fund, or some part of it.' "

See also, *Harris* v. *Citizens Bank & Trust Company*, 172 Va. 111, 200 S. E. 652, decided January 9, 1939; *Clemons* v. *Dennis*, 165 Va. 18, 181 S. E. 387; *Koteen* v. *Bickers*, 163 Va. 676, 177 S. E. 904.

Section 5431, Virginia Code 1936, listing the type of securities in which fiduciaries may invest, is a statute furnishing immunity to those who invest according to the provisions of the statute; but the provisions of the statute are purely permissive and not mandatory. Harrison, Wills and Administration, Vol. 1, page 702; *Powers* v. *Powers, supra.*

In making the investments complained of, the evidence overwhelmingly shows that the administrator, Marshall, exercised, in the light of the conditions obtaining before him, the caution, care and prudence to be expected of the average prudent man in the management of his own affairs. This is the standard of conduct required of a fiduciary. *Harris* v. *Citizens Bank & Trust Company, supra.*

Appellants urge a number of other irregularities, namely, inaccuracy in the figures stated in the fiduciary's reports, non-accounting for interest received in excess of 7 per cent, the lending of certain funds without collateral security, and the borrowing of trust funds by the fiduciary. These charges, except as to the lending of the funds, are negatived by the evidence and were resolved in favor of the administrator by the special commissioner and the trial court. The administrator denied any loans to himself and explained the reasons for the other loans, which loans were duly paid and accounted for by him.

Appellants further urged that the taking of the $500 from the principal account in 1931 and the payment to Mrs. Sallie Martin Buckle was an unauthorized transfer

of principal to income. It is true, as a general rule, that the principal of a trust fund must be preserved intact, according to the terms of the instrument creating the fund, and, when it is clearly provided that the payments may be made to a beneficiary only from the income of the trust fund, the trustee may not break into the principal. This rule does not prevent the correction of an error. If funds belonging to an income account are arbitrarily or erroneously carried to the principal account, as the evidence shows was done in this case, the rule is not violated by an act restoring it to the proper account. No continuance of the original error can change the nature of the fund or the right of the person entitled to it.

Marshall's explanation of the transfer of $500 from the amount formerly carried as interest to income is reasonable. It was, as he said, a reimbursement to the income account of an amount belonging to it, but which had been carried to the principal account through an error of calculation. The transfer did no harm to the estate, since it was not originally entitled to the amount involved. It did no harm to the life beneficiary, for she received interest for years on the amount transferred, and then received the transferred sum itself.

We are not unmindful of the sound and salutary rule, and of the obvious reasons and logic therefor, that a trustee who keeps trust assets in his individual name and without any trust earmarks, bears the risk of any loss of such property. *Mitchell* v. *Moore,* 95 U. S. 587, 590, 24 L. Ed. 492; *Ammon's Adm'r* v. *Wolfe et al.,* 26 Gratt. (67 Va.) 621; 3 Bogart, Trusts and Trustees, section 596.

In the case of *Ammon's Adm'r* v. *Wolfe et al., supra,* it was held that a guardian was liable for the investment of the trust estate in Confederate bonds. The holding was based upon the fact that there was not sufficient evidence to show that the investment, when made, was intended for the ward, and the further fact that the guardian had no right to invest the money in Confederate bonds.

The facts in the instant case are not similar to those in the above case. Here the uncontradicted evidence was that the administrator purchased bonds, regarded by prudent investors as sound, for and with money of the trust estate for the trust estate, and that he earmarked the said bonds in a manner to identify them as the property of the estate for which they were purchased.

We do not approve of any departure from the general rule requiring a trustee or fiduciary to exercise the utmost good faith and reasonable diligence in preserving a trust estate in his care, to keep complete and accurate records, to make, state and report his accounts as required by law, and to distribute such estate only to the persons entitled thereto.

The instructions in the will of Mrs. Martin directing that special care be taken to secure safe and profitable investments and to keep a clear, concise and separate record of all transactions are but an expression of the general principles of a trustee's duty and are in accord with the requirements of the law. They furnish no ground for an extended liability.

We find no error in the refusal of the trial court to deny commissions to the administrator, under the particular circumstances of this case. He has honestly accounted for all of the assets coming into his hands and has by diligent efforts brought additional funds to those assets. He invested the funds of the estate in investments which prudent and cautious business men deemed to be sound and safe. The depreciation in the value of those investments was due to circumstances not only beyond the control of Marshall, but also beyond the control of any known human agency. He stood ever ready to make a statement of his accounts. No loss was suffered by the failure to make or state any of his accounts, or by his method of making the statements. The interested beneficiaries for many years silently acquiesced in the manner in which the accounts were stated.

Virginia Code 1936, section 5409, which provides for the forfeiture of commissions to fiduciaries, has con-

sistently been construed by this court to leave the allowance or disallowance of commissions within the sound judicial discretion of the Chancellor. *Harris* v. *Citizens Bank & Trust Company, supra; Mapp* v. *Byrd,* 169 Va. 519, 194 S. E. 724; *Cannon* v. *Searles,* 150 Va. 738, 143 S. E. 495.

The able, learned and experienced Chancellor, in the exercise of his judicial discretion, evidently bore in mind not only the circumstances surrounding the execution of Marshall's trust, but also the fact that the administrator was required to pay the sum of $800 for laxity in the performance of a duty, rather than for maladministration, in addition to the costs of this proceeding through the lower court. He also was so situated as to have the full opportunity of knowing local conditions immediately adjacent to his city.

We are unable to say that the discretion of the Chancellor has been arbitrarily exercised. The quality of his decision tempering the requirements of law with justice and fair play brings no reproach upon our legal institutions and violates no principle of equity. We are, therefore, of opinion to affirm the decree of the trial court.

*Affirmed.*

CAMPBELL, C. J., dissenting.

I cannot concur in the opinion of the court, insofar as it holds that Frank Marshall should not be charged with the loss sustained by the estate of his decedent, in his unwarranted investment in the Grace Securities Bonds.

Here we have a fiduciary admittedly purchasing bonds in his own name, and not until there was default in the payment of the bonds, do we find that he reported them as assets of the estate. The record clearly shows that the first Grace Securities Bonds purchased by Marshall were coupon bonds purchased in the year 1931, and that he did not make any report to the commissioner of accounts between the period beginning 1931 and ending 1935. His explanation of his purchase of the bonds is as follows:

"Q. The first investment you made in the securities with the Grace Securities Corporation were in coupon bonds?

"A. They were.

"Q. Then, the next evidence of your investment was in registered bonds?

"A. The coupon bonds were called in and registered bonds issued in lieu of them.

"Q. Were they registered in your name or as administrator?

"A. They were registered in my name.

"Q. Please state why you had them registered in your name?

"A. I had had some experience in having stocks and bonds, and stocks especially, transferred, which would be the same thing as registered bonds, and the trustee or registrar agents usually required affidavits or other evidences to show to whom the bonds or stocks belonged. If these bonds had been registered in my name as administrator, I would have to secure orders of court or copies to show my authority for endorsing them, and there is right much red-tape getting these things through, and when the registered bonds were received I marked on them to what estate they belonged in pencil. In fact, I did that on coupon bonds as well, and kept them in a separate envelope from any other papers. The object of the owner being in pencil was so it could be erased when finally sent in for transfer or any other purposes.

"Q. Did you ear-mark them separately from your assets?

"A. Kept them entirely separate. In a different envelope. Kept them in an envelope similar to this (the witness holds up envelope to the attorney). This is not it, I handled so many papers it has come unfastened."

The question of the wisdom of his investment, which the majority opinion defends at length, may be conceded. The vice in his action was in purchasing the bonds in his own name and in receiving checks for interest on the bonds and curtailment thereof which checks were made payable to Marshall individually. The fact that he ear-marked the bonds *in pencil* and placed them in an envelope, should not relieve him of liability if we are to adhere to the rule adopted

in *Ammon's Adm'r* v. *Wolfe et als.*, 26 Gratt. (67 Va.) 621. The facts of that case are thus stated in the syllabus:

"Land of infants is sold in 1859, upon credits extending to January 8th, 1862. Their guardian collected a part of the money in May 1862, and he invested it in March 1863, $3,500 in seven per cent. Confederate bonds, which were found after his death enclosed in a paper endorsed Wolfe's heirs; but the bonds were taken in his own name. Held:

"There is no sufficient evidence that the investment when made was intended for his wards."

Judge Moncure, in delivering the opinion of the court, said:

"These bonds bear date on the 13th of February 1863, and appear to have been obtained by Y. C. Ammon on the 2d of March 1863, before the date of the act of assembly aforesaid. They are payable to him individually, and not as guardian of the complainants. They are the same in form with a large amount of other Confederate bonds issued during the war, and found also by the said administrator among the papers of his intestate, and claimed to be the property of the said intestate. The endorsement, 'Wolfe's heirs $500,' made by said Ammon on each of the seven bonds of that amount as aforesaid, may have been made, so far as appears from the record, long after the bonds were issued, and even long after the war, as the guardian did not die until 1866 or '7; and it is of course not evidence that the ward's money was invested in the said bonds. * * *.

"By taking them in the guardian's own individual name it would have been in his power to claim them as his own individual property if Confederate bonds had appreciated, instead of becoming, as they did, of no value."

The overwhelming weight of authority is to the effect that it is a breach of trust for a fiduciary to invest trust funds in his own name and that he is liable for losses resulting from such investment. See 106 A. L. R. 271.

In *Morris* v. *Wallace,* 3 Pa. 319, 45 Am. Dec. 642, the prevailing rule is thus succinctly stated:

"Granting that Mr. Morris (the Trustee) acted *bona fide*, which I am not disposed to deny, yet this is a practice which we unequivocally condemn, and have always done so, and if persisted in, it must be at the peril of the trustee. The rule which makes them personally liable is intended to prevent fraud, avoiding the temptation to put the profits of the investment in their own pockets, and throw the loss, if any, on others: a temptation to which those who act in a fiduciary capacity are exposed and producing an injustice which may be perpetrated, if allowed, almost without the possibility of detection. It is said that guardians frequently purchase stock in their own names, with the money of their wards, intending it, at the time, for the exclusive benefit of the latter. If so, the sooner there is an end put to the practice the better, as it may lead to fraud, and can answer no good purpose whatever. It does not deserve the countenance of a court of justice for another reason. When the funds of a *cestui que* trust are invested in the name of the trustee there is always a difficulty, sometimes insurmountable, in tracing the money to the benefit of the *cestui que* trust; the consequence of which is, that the funds of the *cestui que* trust are taken to pay the debt of an insolvent trustee. As this is contrary to every principle of equity, it should be avoided, if possible; we, therefore, wish it to be distinctly understood that we regard such an investment as a legal fraud, liable to all the consequences as such, without regard to the intention, or integrity of the trustee, or the honesty and good faith of the particular transaction."

See also, *Groves' Estate* v. *Groves and others,* 120 W. Va. 373, 198 S. E. 142; 26 R. C. L. 1313, 21 Am. Jur., section 273.

For the reasons stated, I am unwilling to place the stamp of my approval upon the conduct of a fiduciary who engages in the beneficial game of "heads I win, tails you lose".