# Richmond

Cadwallader J. Collins, Administrator D. B. N. C. T. A. of the Estate of W. Thompson Barron, Deceased, and W. Thompson Barron v. Hartford Accident and Indemnity Company, the Seaboard Citizens National Bank of Norfolk, Charlotte A. Barron and Richard S. Barron.

November 24, 1941.

Record No. 2409.

Present, All the Justices.

502

The opinion states the case.

*James E. Heath* and *William G. Maupin,* for the appellants.

*Rixey & Rixey* and *Mann & Tyler,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

W. Thompson Barron, of the city of Norfolk, died in April, 1924, testate, leaving surviving him his widow, Charlotte A. Barron and two sons, Richard S. and W. Thompson. His will, written wholly in his handwriting,

was probated on May 26, 1924. On that date the widow qualified as administratrix, c. t. a., giving bond in the penalty of $60,000 with the Hartford Accident and Indemnity Company as surety.

The will, after directing the payment of testator's debts and making certain other incidental provisions, with which we are not here concerned, disposed of his property in the following language:

"My property of all kinds, personal and real, I leave absolutely to my wife, Charlotte A. Barron during her life, and the income from the same to her during her life, and at her death I want it to revert to my sons, equally. In case of her marrying again, then she is to have the income from same during her life, but the property of whatever kind is to become the property of my sons equally—and she can allow them whatever amount of income from the property she may care to give them. In case of the death of the boys during her life, then all the property is to be hers in fee simple and she can dispose of same as she may deem best.

"In case the boys do not desire to become professional men, or in case they cannot have a college education, I would like them to learn a trade so as to enable them always to be able to make their own living."

Charlotte A. Barron, administratrix, c. t. a., promptly paid the funeral expenses, debts and cost of administration, and carried out the incidental provisions of the will. Her final fiduciary account was filed in the office of the clerk of the Circuit Court of the city of Norfolk, on May 22, 1925, and was duly confirmed by that court in accordance with chapter 221 of the Code of Virginia, 1936, (Michie), on June 23, 1925. The account showed that as administratrix, she turned over to herself, as life tenant, the entire *corpus* of the personal estate amounting to $56,272.74, with the exception of commissions due the administratrix of $3,462.27.

After taking possession, as life tenant, of the estate of her late husband, she undertook to operate a large

portion of the businesses formerly conducted by him. Subsequently the entire personal estate suffered great losses and depreciation.

In 1939, fourteen years after the confirmation of her final report, Cadwallader J. Collins, administrator, d. b. n. c. t. a. of the estate of W. Thompson Barron, deceased, and W. Thompson Barron, the son of the testator, as complainants, brought this suit against the Hartford Accident and Indemnity Company, the Seaboard Citizens National Bank of Norfolk, National Bank of Commerce of Norfolk, the Southern Bank of Norfolk, Charlotte A. Barron and Richard S. Barron. No relief is claimed here against the National Bank of Commerce of Norfolk and the Southern Bank of Norfolk.

The object of the suit was to recover for the estate the personal property of which the testator died seized and possessed, and which was alleged to have been wasted by the administratrix, c. t. a. and the life tenant thereof with the aid and assistance of the defendant banks in making to her personal loans secured by stock known to be held by her for life only. It prayed an accounting by the administratrix, c. t. a., a refunding from the banks, and satisfaction from the surety of any deficit in the estate.

The evidence was taken by depositions. The able, learned, and experienced chancellor, after consideration of the evidence and the argument of counsel, held that the testator intended to turn over to his widow his entire property for her life to manage it for herself and her two sons as she thought best; and that since she managed it to the best of her ability, she was not liable for the loss suffered; and consequently that the co-defendants were not liable. The bill was dismissed as to all of the defendants.

The appellants concede in their brief that the decision in this case hinges upon the answer to the question,—whether Mrs. Barron, in her capacity of administratrix, c. t. a., had the right to deliver to herself, as

life tenant, the corpus of the personal estate without requiring of herself a refunding bond with surety for its forthcoming upon the falling in of the life estate.

The testator was a man well past middle-age, married to a woman twenty-five years his junior. At the date of the will, January 7, 1916, one of their sons was about four years of age and the other about five. They became of age, respectively, in 1932 and 1933.

At the time of his death, he owned real estate, consisting of a residence and warehouse property, inventoried at $62,000. He owned and was operating three businesses. He conducted, in his own name, a printing and bookbinding business and managed and controlled two corporations, engaged in paper making, the Seaboard Paper Box Corporation and the Paper Stock Corporation, owning all of their capital stock. He had holdings of federal and municipal bonds in the sum of $2,-000 and capital stock in Norfolk banks aggregating nearly $36,000. The total value of his personalty, including $9,000 in accounts receivable, was appraised at $69,000.

Barron's wife had considerable knowledge of his business affairs. He talked them over with her frequently and conferred with her in all of his moves. The record shows that he thought she was intelligently interested, and that he appeared to have full confidence in her business ability and judgment.

For some years prior to the death of the testator, the printing and bookbinding business had been operated at a loss, but the operation of the two corporations had been profitable and furnished the chief source of income for their owner. Before the settlement of her fiduciary account, Mrs. Barron, as administratrix, sold the printing and bookbinding business, which she also was unable to operate profitably, for $10,000 and used the money for the payment of the testator's debts. She also tried to sell the Seaboard Paper Box and Paper Stock businesses but was unable to do so. She thought it ne-

cessary, therefore, to operate those two businesses in the effort to get income to support herself and her two sons and to pay for their education. Their operation proved profitable under her supervision until about 1930. At that time the great economic and financial depression which began in 1929, was showing its devastating effects upon both businesses and upon all other financial and business concerns.

The business of the Paper Stock Corporation became so poor, when other concerns to which it sold its products closed, that she abandoned its operation and concentrated her efforts upon the operation of the Paper Box Corporation.

Mr. Barron had been a member of the board of directors of the Seaboard bank. Mrs. Barron consulted the officers of that bank and informed them of the condition of the business and the need to secure money to continue its existence.

In the widow's conduct of the business, she borrowed from the Seaboard Citizens National Bank, on April 28, 1930, the sum of $5,000, on her personal note, giving to the bank certain collateral owned by her and, in addition, three shares of the Bank of Commerce stock originally issued as five shares in the name of her husband. The entire proceeds of this loan were deposited to the credit of the Seaboard Paper Box Company and were used in that business.

In October, 1930, and in February, 1931, the Seaboard Paper Box Company got two loans from the Seaboard Citizens National Bank evidenced by its own notes for $5,000 each. These notes were endorsed by the widow personally. She also deposited with the bank one hundred and twenty shares of Seaboard Bank stock and fourteen shares of Citizens Bank of Norfolk stock which had originally stood in the name of her husband but had been transferred, at various times subsequent to 1925, by that bank, at her request, to Charlotte A. Barron individually. This stock was eventually transferred to

the Seaboard Citizens National Bank, as pledgee, in order that it might receive the dividends thereon.

Various smaller loans amounting to $2,000 were made to the Seaboard Paper Box Company, bringing the aggregate sum of its borrowings from the bank to a total of $12,000 in the year 1932. The proceeds of all these loans were likewise deposited to the credit of the Seaboard Paper Box Company, the operating company of the estate, and were used for the benefit of the estate.

The Seaboard Paper Box Company continued to operate. Mrs. Barron stated that without the benefit of the loans, the business could not have been carried on. It was operated until late in the fall of the year 1933. She said that not one penny of the borrowed money was applied to her personal use.

The loans have not been paid and the bank claims a right to hold the pledged stock.

It is uncontradicted that in administering the estate, in turning over the property to the life tenant to manage and conduct, and in all of her moves in carrying on the business, Mrs. Barron acted upon the advice and counsel of two distinguished and experienced attorneys at law, one of whom was the nephew of her late husband.

In 1933, when the worst effects of the depression were being felt and it became apparent that Mrs. Barron could not operate the business successfully in Norfolk, she moved its plant and physical assets to Burlington, North Carolina. She had been trying to sell them and was holding out for the price of $25,000. She commenced new operations at Burlington in a warehouse which she had rented, and began what appeared a period of successful operation.

The insurance company, which had been carrying the insurance on the business for years, decided that the warehouse, in which her plant was located, was an unsafe risk and cancelled her policies of insurance. She was neither able to secure new insurance nor to move

to another building. She at once employed a night watchman and induced her landlord to put in a sprinkler system. Work on the sprinkler system had begun when a fire of unknown origin broke out in a restaurant, which occupied a part of the same building in which the plant was located, and the whole building was burned destroying everything it contained. All of this happened within a few weeks after the removal to Burlington, and at a time when she had engineered the business into such successful operation that there was every indication that she would be able to dispose of the property.

In the meantime, Mrs. Barron had sent her boys through high school and preparatory school, and each of them had a year and a portion of another year at college. She had undertaken to train and educate them to be self-supporting, and in doing this and in trying to carry on the estate so as to provide the income necessary, she had used all of the personal estate, except that which was destroyed by the fire or was held by the bank as collateral security for the loans aforementioned. The three warehouses in Norfolk and the home were all that was left. It is not denied that she acted in good faith and without any improper motive, that she had acted in accordance with advice which she had sought, and that she was satisfied in her own mind that she had the right to do what she did.

The will under review was written by a business man who had been engaged in the printing and paper business for a long time. It names no executor, makes no mention of any surety to be required in the administration of the estate, and bears every indication that it was written without legal assistance.

It is a rule of settled construction that we must give effect to the intention expressed by the testator and carry out the object desired by him in disposing of his property. In construing the will before us, we must gather the intention and object of the testator from the words and language used by him. The surrounding cir-

cumstances at the time of the execution of a will aid us in this determination.

Many cases have been cited to us in the argument and in the briefs. None of the cases is identical with the facts in the instant case. Some are controlled by the rules and practice of the several states.

■ "While decided cases are helpful, they are not necessarily controlling, because no two wills are alike; the words are different; the surrounding circumstances may be different; so that it may be truly said that each will is a law unto itself." *Simmons* v. *Gunn,* 156 Va. 305, 157 S. E. 573.

■ "As it is extremely rare to find two cases alike in all respects, little or no aid can be derived by a court in construing a will from prior decisions construing other wills. It is not enough that the same words in substance, or even literally, have been construed in other cases. It often happens that the same identical words require different constructions according to the context and the peculiar circumstances of each case." *Conrad* v. *Conrad's Ex'r,* 123 Va. 711, 97 S. E. 336. *Kello* v. *Kello's Ex'rs,* 127 Va. 368, 103 S. E. 633, 11 A. L. R. 322; *Bennett* v. *Bradley,* 149 Va. 746, 141 S. E. 756.

■ We have adopted the rule in Virginia that it depends on the will whether or not the life tenant is entitled to possession of the personal property. If a fair construction of its language discloses it was the testator's intention to give the tenant possession during his life, then it is the duty of the personal representatives to deliver it to him without requiring security for its return. *Mason* v. *Jones,* 26 Gratt. (67 Va.) 271. Harrison on Wills and Administration, Volume 1, section 250, subsections 4 and 5.

In *Hawthorne* v. *Beckwith,* 89 Va. 786, 17 S. E. 241, the rule was recognized and referred to.

The Barron will disposes of his property subject to three contingencies. The first sentence leaves all of his property to his wife during her life. It is left to her

"absolutely," that is, wholly and unconditionally, during that period. In addition, it leaves all of the income to her. It gives to her both the property for her life and the income therefrom.

The second sentence provides that in case she remarries, she is to have the income from all of the property, but the property itself is to become the property of his sons equally, and she may allow them whatever income therefrom she sees fit. Under this provision, she is still to receive the income, although the property is to become the property of the boys.

The word "revert" in the first sentence, refers to the possession and control of the property. As used, it indicates a change of possession from the wife to the sons, considered in connection with the language in the second sentence providing for the boys in the event of the widow's marriage. However, the change of possession, in the event of marriage, is to be made without affecting her right to the income.

The two provisions are different, in that the latter provides that she receive only the income from the property, whereas the former leaves to her a life estate super-added with the absolute power to possess it, a power indicating that she is to manage and control it.

The third provision gives her the property in fee simple, even though she has remarried, if the boys die during her lifetime. This provision emphasizes the testator's interest in his wife under all circumstances.

Coupled with the facts that no executor was named and that the testator had complete confidence in his wife and in her ability to manage and control his estate, the words "I leave absolutely," fairly and reasonably show his intention that she was to immediately take his place in the operation and control of his property during her lifetime and until she married again; in other words, that she should step into his shoes and take his place without the intervention or interference of any person or officer.

■ ■ It is unnecessary to enter into any extensive discussion of the words "leave" and "absolutely." In Webster's New International Dictionary (2nd Ed.) Unabridged, among other definitions, "leave" is defined as: "To allow or cause to remain; * * * to let remain unmoved or undone; to refrain from or neglect taking, doing or changing; to let stay or continue; * * * to let be without interference; to suffer to remain subject to another's action, control, or the like; * * * also, to suffer to be undisturbed in action;" also, "to put, place, deposit, deliver or the like, so as to allow to remain." The word "absolutely" is defined as " * * * independently or unconditionally; wholly; positively."

The only limitation upon the right of Mrs. Barron to take the property into possession for her life is based upon her remarriage. It is not difficult to understand that in the event of her remarriage, the testator did not desire his estate to come under the influence of her second husband, but that so long as that influnce was absent, she should have absolute and complete charge for her life. It is to be noted that her life estate was to be enlarged into a fee simple in the event of the death of her sons during her life, although she remarried.

We think that the language of the testator and the surrounding circumstances at the time he made his will reasonably and fairly indicate that in leaving his property absolutely to his wife for her life, and providing that she should have the income from it during that period, he referred both to the possession, management, and control of his property by her during her life and widowhood, and to the enjoyment of the income therefrom during her whole life.

■ The words conferring upon her the possession, control, and management of the estate preclude the idea that it was qualified by a requirement that she should give a forthcoming bond. No duty devolving upon her

as administratrix to require such bond, her surety, the Hartford Accident and Indemnity Company, cannot be held liable for the doing of an act she was authorized to do, since it was surety only for her transactions as administratrix.

 Mrs. Barron, as life tenant, under the peculiar circumstances of this case, held the personal property of the estate as a trustee or quasi-trustee for the remainder-men. *Tabb's Curator* v. *Cabell,* 17 Gratt. (58 Va.) 160; *Mason* v. *Jones, supra.*

As a trustee, she was held to the duty of acting in good faith, in the exercise of a fair discretion, in the same manner in which a man of reasonable intelligence and prudence would act in the management of his own affairs in the light of the conditions facing him. *Clemons* v. *Dennis,* 165 Va. 18, 181 S. E. 387. *Harris* v. *Citizens Bank,* 172 Va. 111, 200 S. E. 652; *Powers* v. *Powers,* 174 Va. 164, 3 S. E. (2d) 162; *Buckle* v. *Marshall,* 176 Va. 139, 10 S. E. (2d) 506.

In applying this rule, the situation must be viewed as it confronted Mrs. Barron at the time when action was required of her, and not by what has been disclosed by subsequent events. As we have seen, she was careful to seek the advice of competent persons. She acted from the best of motives, never undertaking to make a personal profit for herself out of the operation of the estate. The business she conducted and the investments she held in bank stock were among the numberless victims of a financial and commercial depression that shook to its roots the business life of this country. Some of the effects of that sad period are recorded in many reported cases from the courts.

In using some of the property of the estate to preserve some of its other property, Mrs. Barron did what many prudent and capable men did in their own affairs. In fact, there was no other means whereby she had any hope of saving the property which was necessary for the support of herself and her children.

Under the circumstances, she should not be criticized for moving the residue of the business plant to North Carolina. She could not sell it to advantage nor could she operate it at a profit in Virginia. Every prospect favored the move. Its loss by fire was a misfortune for which responsibility should not be placed upon her. She carried insurance as long as she could, and after it was cancelled, promptly made every reasonable effort to protect the property. No more could have been required of her. The fire loss was the crowning disaster following a series of misfortunes beyond her control. Notwithstanding the severe effect of the depression upon the assets of the estate, much of it might have been saved had it not occurred. Closing up or shutting down the operation of the business would have destroyed it. Taxes and insurance would have consumed the physical assets. It had to be operated or perish. The widow was faced with a dilemma which she met with courage and determination, aided by the advice of those whom she had a right to trust.

Having reached the above conclusion that neither the administratrix, c. t. a. nor the life tenant is legally chargeable with responsibility for the loss of the assets of the estate, it is apparent that the Seaboard Citizens National Bank of Norfolk cannot be held liable for transferring the bank stock of the estate to the widow and in lending money to the estate, secured by that stock. The transfer of the capital stock was necessary to complete the authorized delivery of the personal estate to Mrs. Barron. The Seaboard Paper Box Company was a part of the estate and owned entirely by it. The lending of the money to the estate, upon the security of the estate, was not unjustified under the circumstances and situations with which Mrs. Barron was confronted in her efforts to preserve the property.

Since the administratrix, c. t. a. had the right to transfer the assets of the estate to the life tenant without requiring a refunding bond, and Mrs. Barron, as life tenant with power of possession and control, was not guilty of the violation of her trust, then no wrong was committed by those who aided her in either of the capacities in which she acted.

In view of the foregoing conclusions, which determine the case upon its merits, we are of opinion that the decree complained of was plainly right and that it should be affirmed.

*Affirmed.*