# Staunton

## THE COMMERCIAL AND SAVINGS BANK OF WINCHESTER, VIRGINIA v. MINNIE E. BURTON ET ALS.

September 6, 1944.

Record No. 2768.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Herbert S. Larrick, F. S. Tavenner* and *F. S. Tavenner, Jr.,* for the appellant.

*H. K. Benham* and *Clarence E. Martin,* for the appellees.

BROWNING, J., delivered the opinion of the court.

When this controversy arose, and its sequels were first conceived, a number of issues were urged in the pleadings which are not now relevant in view of this frank avowal found in the appellee's brief:

"We eliminate the allegations relative to the Bryan note, because it is doubtful whether it could have been collected. The National Fruit Products Company stock, the Commercial and Savings and the Farmers and Merchants were all Winchester investments. The evidence relative to them met the required tests, and while the loss to the estate is considerable, we could not honestly ask the Court for any decree with relation to these items."

We note that all of these items were at first the subjects of alleged negligence.

The suit is to surcharge and falsify the settlements and accounts of the Commercial and Savings Bank of Winchester, Va., administrator c. t. a. of Rose Lee Snyder, dec'd.

Some incidental relief was also sought. The Winchester bank's connection with the matter comes from the following provision in the will of Mrs. Rose Lee Burton Snyder:

"All stocks, bonds, loans and cash of which I die possessed, other than the sums I have heretofore named, I desire placed in the hands of the Commercial and Savings Bank of Winchester, Virginia, to be administered by said bank as a trust fund for the benefit of my two sisters, Minnie E. Burton and Genevieve Burton, the interest from this fund to be paid to Minnie E. Burton and Genevieve Burton quarterly or four times a year as long as they shall live, in equal amounts to each—which of these two sisters die first the remaining sister is to have her half that is left or the whole of the interest of the trust fund."

The Misses Burton were the complainants. The Winchester bank was the principal defendant. Fourteen reversioners, named in the will, were also impleaded as defendants. Ten of them filed answers praying for the affirmative relief sought by complainants.

The issues practically simmered down to the one contention that the Winchester bank was negligent in its failure to

make disposition of certain shares of stock of two Texas banks belonging to the estate of Mrs. Snyder. Mrs. Snyder derived her estate, by will, from her husband, John Snyder, who died in October 1920. She died in July 1927, leaving the estate, practically as she received it, and in which form it passed under her will, the pertinent provision having been heretofore quoted.

It was appraised at $36,000, in round numbers, and it consisted as of November 1927, of personal notes, aggregating $14,000; shares of stocks of Winchester banks appraised at $3,400; shares of the National Fruit Products Company, a Winchester corporation, at $1,500; 10 shares of the First National Bank of Kaufman, Texas, at $1,850; 50 shares of American National Bank of Paris, Texas, at $11,000; some bank balances and various articles of personal property, as furniture, books, jewelry, etc.

The personal notes referred to were the obligations of persons who lived in Texas. Mr. and Mrs. Snyder resided there for a number of years before they came to Winchester to live, hence the Texas investments and transactions. . Mr. S. L. Bedford, the president of the American National Bank of Paris, Texas, was their banker, personal friend, and business adviser; indeed, two of the notes, of $2,000 and $1,000, respectively, were his own obligations to the estate.

The Winchester bank qualified on the 19th day of September, 1927, as administrator c. t. a. by taking the prescribed oath and giving the bond required. It made its settlements, as *executor* of Rose Lee Snyder, and this discrepancy, if we may so call it, is made the subject of severe criticism.

This, with its failure to qualify as trustee and turn over the estate from itself, as personal representative, to itself, as trustee, is the basis of a stern attack upon the legality of the bank's administration of the estate.

At the outset we may say that we think that the contention has technical merit. If the matter had been pursued as outlined by the appellees the result would have been orderly and in good form. But the effect would probably not have

been different and the contention, we think, is more fanciful than real.

As we have seen, the Winchester bank became the administrator c. t .a. on September 19, 1927. On the same day appraisers were appointed and an inventory and appraisement was filed in the clerk's office of the corporation court of the city of Winchester on October 3, 1927, which was confirmed and recorded on November 3, 1927. This listed and valued the items of the estate.

The Winchester residence was the subject of an independent clause of the will. It may be well to state here, in this connection, that the testatrix, after providing for an estate, less than a fee simple, further provided that if at any time it was thought best to sell the residence, the Commercial and Savings Bank of Winchester should sell it and add the money to the trust fund in its hands to be administered.

The bank, in its fiduciary character, collected the items of personal indebtedness in Texas, with the exception of the Bryan note of $3,000, which was admittedly uncollectible. The American National Bank of Paris, Texas, closed its doors in 1931, and the First National Bank of Kaufman, Texas, went down in the following year. The shares in both banks held by the Snyder estate perished with them.

The settlements referred to showed the receipts and disbursements made by the bank in its fiduciary character. They showed the investment of the funds derived from collections made. It may be said that they are mechanically inartificial. They do not reflect the technique of expert bookkeeping. Many of the items are without explanatory legend. They lack identification data which has to be supplied by mental processes. But they contain enough to show the source of the receipts and the purposes to which they were applied, the legitimacy of which is not successfully questioned.

Employing the pinciple, *id certum est quod certum reddi potest*, the vices urged with such insistency may be overcome by reference back to the original .commissioner to re-

form the settlements in the respects indicated. But is it necessary? We think not. It will be remembered that the bank, as executor, made four settlements, one in 1928, one in 1932, one in 1934 and one in 1935. No exceptions were taken to any of them. They were all confirmed by the court and recorded becoming thereby notice to the complainants and the reversioners and to everyone else. Incidentally we note that these settlements cover twenty-two payments to Miss Genevieve Burton aggregating $2,976.43, and nineteen payments to Miss Minnie Burton aggregating the sum of $2,500.08. Two payments were made to each of them in the year 1935, which is the date of the institution of the suit. Mention is made of this because appellees emphasize the charge that they were sparingly, if not harshly, dealt with by the bank. It also appears that the specific articles of personal property bequeathed them were delivered to them. It further appears that ample opportunity was afforded for timely exceptions to the accounts, or any item thereof, if unsatisfactory, or if surcharge and falsification were contemplated.

It is also in evidence that the bank in its fiduciary character furnished counsel for the appellees with an audit of its accounts. We think there was no necessity for a further reference. It could only result in a recapitulation of what had already been supplied and what the court and everyone else already knew.

The position we take is strengthened by the oft iterated principles of law that a fiduciary's accounts settled before a commissioner are presumed to be correct and the burden of proving them incorrect is upon the attacking party.

These found forceful expression in the case of *Powers* v. *Powers*, 174 Va. 164, 3 S. E. (2d) 162, where we said through Mr. Justice Gregory:

" . . . . . . that the ex parte settlements of the commissioner of accounts are presumed to be correct until surcharged and falsified, and not only the duty of specifying

errors, but also the *onus probandi*, devolves upon the party complaining."

The great weight of the testimony compels the conclusion that the appellees have not sustained this burden.

The motion of the complainants to introduce and file the unsigned, incomplete, and unannounced paper called, "The Opinion", of Judge Williams, should have been overruled. As great as is this court's respect for the memory of that able and eminent judge it cannot lend its accord to that ruling. We do not know the theory upon which the motion was sustained. It does not appear in the record, but we think the paper was without any legal status whatever and had nothing to do with the case.

Perhaps we should have said in the beginning that the defendant fiduciary bank interposed a demurrer to the original and amended bills of the complainants. The grounds of the demurrer brought in question certain of the issues which we have discussed, and asserted the additional ground that one seeking to surcharge and falsify an account should set forth distinctly the items of surcharge and falsification. This is eminently correct. The decrees of the court sustained the demurrer on all of the issues except that relating to the disposition of the stock of the two Texas banks. It held that the fiduciary bank failed to use proper care in an effort to sell the said stocks and it was negligent in holding said investments outside the state of Virginia without asking the guidance of the court and it fixed the value of said shares at their par value, which was $5,000 in the case of the American National Bank of Paris, Texas, and $1,000 in the case of the First National Bank of Kaufman, Texas, and decreed that the complainants were entitled to recover from the fiduciary bank the said amounts with interest thereon from January 1, 1931. The cause was also referred to another commissioner to report certain things therein recited.

The substance of the fiduciary bank's assignments of error has been already discussed. It remains for us to consider the Texas bank stock phase of the matter.

The two Texas banks were located in Lamar County which is distinctly an agricultural community and the staple and principal crop is cotton. It is the controlling factor in the commercial life of that and the surrounding counties. Cotton is as much the dominant element in business there as is tobacco in Mecklenburg and Halifax counties in Virginia. In 1925, 73,000 bales of cotton were produced in Lamar County and in that year the average price for it was 19.88 cents per pound. In 1928 there were made about 30,000 bales of cotton and the price was as low as six cents per pound.

In 1926 the First National Bank of Paris failed. Its stockholders were assessed 100% in addition to the par value of the stock. The federal and state laws at that time provided for what is called double liability. Seventy per cent of the stockholders of that bank were sued for the assessments. In that year, there were five banks in the city of Paris. All except two failed. Nine of the 14 banks in Lamar County failed. C. B. Harton, who was the Vice-President of the First National Bank of Kaufman, who testified in this case rather graphically described the conditions that obtained in that county. These are his words:

"Well, we are suffering today from 1920. 1920 is really the starting of the financial crash that culminated in 1931 and 1932 and we just bumped along from 1920 on. 1921, '22, and 1923 we did fairly well. '25 and '26 was an awful jolt. In 1927, '28, it looked like we might be able to come back, and in 1932 we went on downhill."

This witness testified with reference to the saleability of the 10 shares of Snyder stock of his bank. The President of that bank was J. A. Nash, Sr. His examination was as follows:

"Q. Did you have any conversation with Mr. Nash in reference to this?

"A. You mean to this stock or this letter?

"Q. Yes.

"A. Well, really I don't recall, but I am sure he handed me that letter to answer.

"Q. Was there any discussion between you and him at that time or prior to that time in reference to a sale of stock?

"A. To the sale of stock?

"Q. That particular stock.

"A. Only in a casual manner. He was having some trouble with these people concerning their stock that they wanted to sell and were wanting him to buy it.

"Q. Did he or not buy the stock?

"A. He did not.

"Q. Do you know at that time, Mr. Harton, whether or not there was any market sale for that Snyder stock?

"A. I am sure there was not. He would have sold it.

"Q. You know those facts of your own knowledge?

"A. Yes, sir. I know he wanted to sell the stock for them and get rid of them. They were causing him a great deal of worry.

"Q. On account of them pressing him for a sale of that stock. From 1926 to past 1928, do you know of your own knowledge that there was no sale for the stock and that in order to have them quit worrying him he would have sold the stock?

"A. Yes, sir. He would have bought it himself had he been able.

"Q. Now from September 1928 and on through 1928 and 1929 and probably later, they were continually pressing Mr. Nash as President of the bank for a sale of the Snyder stock?

"A. Well, I could not say continually, but I know on several occasions that they happened to.

"Q. And do you know of your own knowledge that during that period of time there was no sale for the Snyder stock?

"A. Yes, sir."

It may be well to say here that the appellees stoutly maintained that the fiduciary bank should have advertised the Texas bank stocks for sale at their respective locations, and its failure so to do was negligence. It is appropriate now to quote again from Mr. Harton's testimony.

"Q. Mr. Harton, during the unprecedented financial depreciation from 1920, would it in your opinion, had the stockholders of the bank advertised it in the newspapers at public sale, would it have 'busted' the bank before it could have been sold?

"A. I would say yes."

W. W. Biard, a farmer, and secretary and manager of the Chamber of Commerce of Kaufman, Texas, was asked this question:

"Q. Do you know of your own knowledge whether or not from November, say from September 1927 through 1928 and on up until the First National Bank closed its doors, was there any market for the stock in the First National Bank during that period of time?

"A. I know that there was not any demand for First National Bank stock during the years 1926, '27, and 1928, and up to the time it closed. I don't know what time that was but from 1926 until it closed there was no sale for it at all.

\*       \*       \*       \*       \*

"Q. From your knowledge of business conditions existing here since 1920, has there been a single person in this community who would have invested cash money in stock in the First National Bank?

"A. I don't think so."

Mr. T. A. Carlisle, a business man in the city of Kaufman engaged in the hardware and implement business, was examined, in part, as follows:

"Q. You were familiar with the general financial condition of this community during 1926, '27 and '28; from your knowledge of the financial condition of the community at that time would you say there was a cash market for bank stock?

"A. I would say there was not."

Mr. J. M. Caviness was assistant cashier, vice president and executive vice president, at different periods, of the First National Bank of Paris, Texas. At the time that he testified

he was general manager of the Paris and Mt. Pleasant Railroad Company. He was asked these questions:

"Q. Then from your connection with the bank stated and your business transactions with the American National Bank of Paris, Texas, during those times, are you in a position to state from your knowledge, what, if anything, was the market value of the stock of the American National Bank?

"Q. Answer the question whether you are in a position to state, if you know?

"A. I don't think it had a market value.

       \*         \*         \*         \*         \*

"Q. What was the business and financial condition of affairs in Lamar county, Texas, during that time?

"A. In 1926 things in a business way got to be in a pretty bad condition in this part of the country, in Lamar county, particularly as I remember, we had a very small crop that year due to weather conditions, hail and otherwise and insects; also conditions had become rather strained here in banking circles because in the early part of 1925 one of the oldest banks in the city had to reorganize, or its affairs were taken over by the Liberty National Bank of Paris, Texas, with a loss to the old stockholders of The City National Bank of their entire stock, an assessment was not levied. In May, 1926, I think it was May 26th, 1926, The First State Bank of this city failed and its affairs were placed in the hands of the Commissioner of Banking of the State of Texas and a one hundred per cent assessment levied against the stockholders of that institution. They had formerly reduced their capital from $150,000 to $100,000 and the stockholders were later assessed one hundred per cent on the $50,000 reduction of capital that had been approved by The Commissioner of Banking. These things of course, had coniderable bearing on the banking situation because they tended to unsettle and unbalance the confidence of the people of these communities not only the bank that failed but other banks; funds were withdrawn from the other

banks in this city and placed in different channels, I believe that is the biggest things that affected it.

*      *      *      *      *

"Q. Now Mr. Caviness, considering that you were an active banker during all the times inquired about above and from your activities as you have already stated in your various capacities as banker, employee and officer, tell the Court what effect that the partial failure of the cotton crop in the year 1926 and the failure of the First State Bank in Paris, had upon those banking institutions?

"Q. And including this particular bank, The American National Bank?

"A. It had a bad effect.

"Q. What effect did it have upon the commercial value of this stock of those banks and other banks down in this community?

"A. It had the effect of destroying the market for bank stock in this community, I won't say damage, but the assessment levied against the First State Bank scared people that held stock in other banks, because they felt that it was bad to lose the stock investment that they had, but the assessment of it, levying one hundred per cent assessment of it was tended —to make people lose interest in the purchase of bank stock, and also caused some people to transfer stocks that they had to others that were not so responsible."

This witness, under a rigid cross-examination, answered questions as follows:

"Q. Now this ten shares of stock of The American National Bank, which The Lamar State Bank & Trust Company held, it was after The American National Bank ceased to declare its dividends that you tried to sell that stock?

"A. No, sir, I tried to sell it before.

"Q. How long before, do you know?

"A. I should say at least two years before, two or three.

"Q. Didn't try very hard, did you?

"A. Yes, sir.

"Q. You had a very good dividend?

"A. Yes, did almost everything, but blackmail, we did everything but advertise it, we didn't feel that would be the best interest of the banking institution in this community to advertise it.

"Q. Well you didn't advertise it?

"A. No, sir.

"Q. In other words, you made no intense effort to sell it?

"A. Yes, we did make an intense effort to sell it.

"Q. To the stockholders of The American National Bank?

"A. Yes, sir.

"Q. But you didn't go around and try to sell it as you would a piece of property, something of that kind?

"A. I would say we made more effort.

"Q. Well you probably made it, but just tell us the kind of effort you did make?

"A. Well we contacted every one that we felt we might interest due to their holding of stock in The American National Bank, that is, that were in this community."

To continue to quote evidence would unreasonably prolong this already too long opinion. We will have to content ourselves with commenting upon the witnesses and their testimony.

Mr. S. L. Bedford, already spoken of as the confidential agent and adviser of the testatrix and Miss Genevieve Burton, was president of the American National Bank, 50 shares of the stock of which was owned by the Snyder estate and which became worthless when the bank closed its doors, testified that, at the instance of the fiduciary bank, he tried to make sale of the Snyder block of stock but that there was no market for it after July 1928, when the board passed a dividend; that Mr. Sloat, trust officer of the fiduciary bank, had sought his assistance in an effort to dispose of the stock but witness was unable to find a market for it. It is true that the strength of his testimony was somewhat weakened by an unrelenting cross-examination, but the effect of it was that on account of the prevailing conditions it would have been exceedingly difficult, if not impossible, to have dis-

posed of the large Snyder block of stock. At the time Mr. Bedford testified he was the general agent for the Frisco Railroad Company. This is said because, to command such a position, shows, in some sort, the type of person that he was.

As was said by Mr. Justice Spratley in the case of *Buckle v. Marshall*, 176 Va. 139, 10 S. E. (2d) 506: "In 1930, the rapidly advancing shadows of the tragic financial and economic depression, which was to be felt so severely later on, began to affect all classes of property and securities. Real values disappeared almost over night."

This is accurately descriptive of the conditions which obtained during the period referred to in Texas and, indeed, throughout the country. It is in evidence that real estate in Lamar county, which was conservatively estimated from $150 to $300 per acre, went down to $50 and $60.

Mr. H. L. Baker had been for a number of years President of the Lamar State Bank and Trust Company of Paris, Texas. At the time he testified, he was the liquidating agent of that company which had fallen into distress. He said that the conditions which obtained in his county, and throughout the country, from 1925 through 1933 had a very depressing effect upon the value of bank stock; that there was no market value for it. He said that his banking company held ten shares of the stock of the American National Bank of Paris and that repeated efforts were made to sell it but without success and when this witness was asked, upon cross-examination, how the bank got it, his answer was: "Well it was slipped over on us, as collateral, we didn't buy it, it was collateral and we had to take it."

This seems convincing that there was no promising incentive for the fiduciary bank to make other efforts, than those employed, to sell the Texas bank stock. Mr. Morris Fleming of Paris, Texas, who was cashier of the Lamar State Bank and Trust Company of that city also testified that his bank tried to sell the ten shares of stock of the American National Bank from 1924, which was the year it

acquired it, until the bank closed and was unable to do so and this question was asked him:

"Q. Mr. Fleming, what in your opinion, would have been the result if this stock had come into your hands to be sold and you had advertised that stock for sale, I asked you if you would have advertised it, and you said you didn't know that you would have acted any different, I ask you now what in your opinion would have been the result if you had advertised this stock for sale.

"A. I think it would have closed the American National Bank."

The appellees made vigorous efforts to show that there had been sales of bank stock in the city of Paris during the period with which we have been concerned. We may say that in the main they were futile. Connected with very nearly every transfer of stock there was some controlling or inducing motive, other than the profitable investment of funds. Some of these motives were, salvaging something out of bad loans, collateral for unpaid obligations, dumped on the bank, the acquisition of stock to qualify as a director or an official of a bank, and shares distributed on account of the division of estates which was, of course, *ex necessitate*.

The trial court in this case decreed, in effect, that the guidance of the court would have exculpated the fiduciary from the charge of negligence. If the fiduciary had sought and obtained this, of course, there could have been no semblance of the charge. Such step would have been prudent and precautionary. But let us view it as a practical matter. The court would not have lent its aid unless it had some evidentiary basis for it. The source of this evidence to enlighten the court would, of course, have been in Texas and in the light of the evidence which we have quoted, with which the record abundantly abounds, the guidance of the court must have resulted in precisely the course adopted by the fiduciary.

We now recast the setting of this case. Dr. Snyder, the husband of the testatrix, invested his money in the securities which constituted his personal estate. Of all of them, he

valued most his Texas bank stock. He so expressed himself to his nephew, Mr. Sheetz, the son of his only sister. He wished that he had had all of his money so invested. This stock passed to his widow as his legatee. She held it intact for seven years, as though she were unwilling, certainly hesitant, to be rid of securities so prized by her husband. In the very form it was, it passed by her will to the fiduciary bank. The testamentary provision gave no express authority to sell or change the investments. It did not make it obligatory so to do.

The fiduciary incurred scarcely any expense in the administration of its trust. An effort to fix upon the estate a double liability assessment, made in a federal court, was successfully repulsed. Commendable mention of this appears in the record. From citations from the evidence which we have made it appears that in one instance, that of the Kaufman bank stock, the bank officials, including Mr. Nash, the President, were pestered and troubled by the insistence from Virginia that the Snyder stock be disposed of. This must have come from the fiduciary. Its urgency found expression in the declaration that Mr. Nash would have bought the stock himself if he had had the money to pay for it.

This court has had like issues before it in a number of recent interesting cases. In *Harris* v. *Citizens Bank, etc., Co.*, 172 Va. 111, 200 S. E. 652, the case *In re Pettigrew's Estate*, 115 N. J. Eq. 401, 171 A. 152, 155, is approvingly quoted as follows:

"For the precipitous decline in the market and the general economic depression which followed, the executors cannot be held to account. To have sold the securities under such conditions—and at a time when even financial geniuses were literally pouring their fortunes into the stock-market coffers so that they might be able to hold rather than sacrifice their securities—would probably have rendered the executors surchargeable for what then, to most all, hopefully appeared to be but temporary and retrievable abnormal shrinking in values."

How virulent would have been the criticism if the fiduciary had advertised the Texas bank stocks, in the face of the conditions which existed and its action had caused the closing of the banks, or otherwise disclosed the worthlessness of the stocks. Would it not have been subject to the charge of a reckless disregard of its duty to conserve its trust subjects? *Harris* v. *Citizens Bank, etc., Co., supra,* is one factually most like the case which we are considering. There we find this quotation from Prof. Minor in 2 Minor's Inst. (4th Ed.), p. 255:

"But nothing more is in general required than that he should act in good faith, and with the same prudence and discretion that a prudent man exercises in his own affairs. If more than this were exacted, it would tend to the disadvantage of persons interested in trusts in general, because it would discourage competent persons from accepting the administration of trusts," quoted with approval in *Shepherd* v. *Darling,* 120 Va. 586, 91 S. E. 737, 739.

In *Clemons* v. *Dennis,* 165 Va. 18, 181 S. E. 387, 388, this court said through Mr. Chief Justice Campbell, quoting from the case of *Mecklenburg County* v. *Beales,* 111 Va. 691, 69 S. E. 1032, 1033, 36 L. R. A., N. S., 285:

"The question of the liability of executors, guardians, trustees and other fiduciaries for loss of funds by bank failures and otherwise has been frequently considered by this court, and the rule established that as to such a fiduciary, in handling private funds, he is not responsible for the loss resulting, where he has acted in good faith and in the exercise of a fair discretion, and in the same manner as he probably would have acted if the subject had been his own property and not held in trust."

In the case of *Powers* v. *Powers, supra,* this court quoted from Harrison on Wills and Administration, Vol. I, p. 705:

"The inquiry in every case in which it is sought to fix a liability upon a fiduciary is:

1. Did he act within the scope of his powers and duties?
2. Did he act in good faith?
3. Did he act with ordinary prudence?

If he did so act, he is not responsible for the consequences of the act, though it result in the loss of the trust fund, or some part of it."

The same principles, expressed in a different way were stated by this court, through Mr. Justice Holt, in *Harris v. Citizens Bank, etc., Co., supra*:

"The standard by which the conduct of trustees, executors and other fiduciaries is to be measured has been many times stated and restated, both in this State and elsewhere. They are required to do those things which a man of reasonable intelligence and prudence would be expected to do in the management of his own affairs, but this rule, like most rules, is to be construed in the light of the conditions obtaining when it is applied."

In the very recent and interesting case of *Collins v. Hartford Acci., etc., Co.*, 178 Va. 501, 17 S. E. (2d) 413, 137 A. L. R. 1046, this court through Mr. Justice Spratley again stated the duty of a trustee:

"As a trustee, she was held to the duty of acting in good faith, in the exercise of a fair discretion, in the same manner in which a man of reasonable intelligence and prudence would act in the management of his own affairs in the light of the conditions facing him."

In that case, those cases which we have already cited are listed as relied upon.

The test of what a reasonably prudent person would do with his own is seen in what a large number of persons, some of them presumably of that character, did do.

The evidence surely discloses that the vast number of stockholders, of the banks in question, in the light of existent conditions, did not sacrifice their holdings, but clung to them, hoping for a brighter and better day.

Upon the law which we have quoted and facts which we have detailed, the decree in this case must be reversed. There is no question of *mala fides*. The appellant fiduciary acted in good faith. The evidence justifies the statement that it exercised a fair discretion in the same manner in which one of reasonable intelligence and prudence would act in the

management of his own affairs in the light of the conditions with which it was faced. The decree is reversed, and the case is remanded for such further proceedings as the court may be advised not in conflict with this opinion.

*Reversed.*